*CJP Supp. 5 Opinion
YEW, Chairperson.
I.
INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge Valeriano Saucedo, a judge of the Tulare County Superior Court since 2001. The Commission on Judicial Performance (commission) commenced this inquiry with the filing of its notice of formal proceedings (Notice) on December 19, 2014.
The Notice charged Judge Saucedo with creating and sending to his own home address an unsigned crude letter accusing his courtroom clerk, Priscilla Tovar, of having an affair with a court bailiff; the letter was addressed to Tovar’s husband at his place of employment. The judge is further charged with showing the letter to Tovar and using it in an attempt to pressure her to have a “special friend” relationship with him. The Notice alleges that the judge falsely told Tovar that he had called the husband’s place of employment and intercepted the letter before it was delivered to her husband. The judge is charged with engaging in a course of conduct during the next two months in which he sent Tovar hundreds of text messages of a personal nature, gave her approximately $26,000 in gifts, including a BMW automobile and a Disneyland trip package for her family, and provided legal advice to her son.
The Supreme Court appointed three special masters to hear and take evidence and to report to the commission under commission rule 129. (All references to a rule are to the Rules of the Commission on Judicial Performance.) The masters are Hon. Judith L. Haller, Associate Justice of the Court of Appeal, Fourth Appellate District; Hon. Becky Lynn Dugan, Judge of the Riverside County Superior Court; and Hon. Louis R. Hanoian, Judge of the San Diego County Superior Court.
The three masters held an evidentiary hearing April 6 through April 10, 2015, followed by oral argument on April 27, 2015. The masters filed their report containing their detailed findings of fact and conclusions of law on July 8, 2015. The commission heard oral argument on October 7, 2015.
The masters concluded that the charges were proven by clear and convincing evidence. The masters rejected Judge Saucedo’s testimony that he did not write the anonymous letter and that his actions related to the gifts and text messages reflected only a sincere desire to mentor Tovar through a difficult *CJP Supp. 6 financial period. The masters found “Judge Saucedo created the unsigned September 2013 letter, used it as a basis to foster a close, personal relationship with Tovar on the pretext he intended to help her, and then inappropriately pressured her to maintain this relationship by giving her valuable gifts knowing she had limited financial resources and was vulnerable to these offers.” We adopt the masters’ factual findings, which we have determined are supported by clear and convincing evidence.
The masters concluded that Judge Saucedo’s conduct violated numerous canons of the California Code of Judicial Ethics and brought the judicial office into disrepute. The masters found that the judge’s “creation of an embarrassing, sexually explicit letter for the sole purpose of manipulating his courtroom clerk is the essence of an act committed in bad faith,” and his “ongoing dishonesty and subterfuge additionally shows bad faith.” As discussed in this decision, we conclude the judge engaged in willful misconduct in those instances when he was acting in a judicial capacity and prejudicial misconduct in other instances, each of which is a basis for removal. (Cal. Const., art. VI, § 18, subd. (d).)
The deceitful, calculated, and unseemly nature of the judge’s misconduct, compounded by his lack of candor in response to the commission’s investigation and untruthful testimony under oath before the masters compels our decision to remove Judge Saucedo from office. We recognize Judge Saucedo is a well-respected jurist who has devoted many hours to giving back to the community. Nonetheless, his reputation cannot redeem the seriousness of his wrongdoing, nor obviate the need for removal in order to fulfill our mandate to protect the public and maintain public confidence in the integrity of the judiciary.
Judge Saucedo is represented by attorneys Randall A. Miller and Caroline van Oosterom, of Miller Law Associates, APC, Los Angeles, California. The examiners for the commission at the proceedings before the special masters were James L. Harrigan, Esq., and commission assistant trial counsel Valerie Marchant. At the appearance before the commission, the examiner for the commission was Gary W. Schons, Esq.
II.
FINDINGS OF FACT
A. Legal Principles
The examiner has the burden of proving the charges by clear and convincing evidence. (Broadman v. Commission on Judicial Performance *CJP Supp. 7 (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true. [Citations.]” (Ibid.) Factual findings of the masters are entitled to special weight because the masters have “the advantage of observing the demeanor of the witnesses.” (Ibid.; see Inquiry Concerning Freedman (2007) No. 179, Decision and Order Imposing Public Censure, p. 7 [49 Cal.4th CJP Supp. 223, 232] (Freedman).)
The following facts are adopted from the masters’ factual findings, which we have determined are supported by clear and convincing evidence based on our own independent review of the record. Where there were disputes in the testimony, largely between Judge Saucedo and Tovar, we have adopted the credibility determinations of the masters. We find those determinations are supported by a sound and thorough evaluation of the testimony of the witnesses, including their demeanor, responsiveness to questions, and whether their testimony was consistent with documentary evidence and prior statements. This evaluation led the masters to find Tovar’s testimony to be credible and her version of events to be true. We reach the same conclusion.
B. Judge ’s Courtroom and Staff
In 2013, Judge Saucedo was assigned to department 6 in the main courthouse in Visalia. His staff included court reporter Kim Werth and court clerks Priscilla Tovar and Theresa (Tessie) Velasquez. Tovar is married and has four children. Her husband’s name is Hilario Tovar; his nickname is Lalo (a common nickname for Hilario). Several years earlier during a marital separation in about 2007 and 2008, Tovar had a romantic involvement with court bailiff Jeremy Knoy. This romantic relationship was well known among court staff. In the fall of 2013, Tovar lived “paycheck to paycheck” and frequently had trouble meeting her financial obligations.
Court reporter Werth has worked for Judge Saucedo since 2001, and was still working for him at the time of the hearing before the special masters.
Judge Saucedo presided over a busy criminal department, where he was regarded as a hardworking and demanding judge who strictly controlled his courtroom. But Judge Saucedo maintained a comfortable, social, family-like environment for the staff, which included potlucks and birthday celebrations. Judge Saucedo, Werth, and Tovar would occasionally go to lunch and would discuss personal matters.
Tovar and Velasquez had work desks facing each other directly outside the judge’s chambers. Judge Saucedo generally left his chambers door open. Tovar and Velasquez frequently talked about personal matters while they *CJP Supp. 8 were at their desks. In 2013, these conversations included that Tovar previously had a romantic relationship with bailiff Knoy; her husband was having an extramarital affair; she owed bailiff Knoy money pertaining to a vehicle he cosigned for her sister; and her husband had recently started a new job at a nearby medical center.
C. Gifts to Tovar in Late Summer 2013
In August 2013, Judge Saucedo gave Tovar $50 for her birthday and $50 for her son’s athletic fundraiser. This was the first time he had given money for her birthday.
In early September, Judge Saucedo told Werth and Tovar he had purchased a red Mercedes convertible, and wanted them to see the car at lunchtime. Later that day, Judge Saucedo took Tovar on a 15-minute ride in the car. During the ride, Judge Saucedo said, “ ‘Who knows, maybe one day you can own a car like this,’ ” or “ ‘You’ll own a car like this.’ ”
On Friday, September 13, Judge Saucedo gave Tovar about $50 or $100 to buy a new cell phone because her phone screen was broken. Tovar responded she did not need a new phone, but he insisted. Judge Saucedo texted her during the weekend, asking if she had purchased a new phone, which she had not done.
On Monday, September 16, Judge Saucedo gave Tovar more money for a new phone and said she should consider it an additional birthday gift. He told her to text him after she purchased the phone.
Later that evening, Tovar purchased the new phone and stopped by Knoy’s house on the way home to visit his dog (a dog previously owned by Tovar’s family). Later that night, Tovar and Judge Saucedo exchanged several text messages about the new phone.
D. The Anonymous Letter
On September 17, Judge Saucedo’s wife, Teresa Saucedo, saw an envelope delivered to their home, addressed to her husband and marked “Personal and Confidential.”[1] She did not open the envelope, but Judge Saucedo opened it when he came home and then showed her the following anonymous letter:
“Hilario Tovar
*CJP Supp. 9 “c/o Tulare Regional Medical Center
“You probably already know and approve. Your wife Priscilla has been having an affair with Jeremy Knoy the bailiff in Department 5 of the Courthouse. She fucks him after work. He brags that she is a good fuck and you get sloppy seconds. He brags about her tattoos, and big boobs and tight ass. The only thing he complains about is her c-scar.
“Sent this to her judge.
“JK’s Friend”
Mrs. Saucedo said that someone must be “ ‘really angry at this woman,’ ” and Judge Saucedo responded that he would take the letter with him to work and discuss it with Tovar.[2] Judge Saucedo also said, “ ‘What if her husband gets this and beats her up?’ ”
The next day, September 18, at about 8:15 a.m., Judge Saucedo called Tovar into his chambers and told her to close the door. Judge Saucedo showed her the anonymous letter. The letter was attached to Judge Saucedo’s typed cover letter stating the unsigned letter would be upsetting and she should remain calm and he would help her if she wanted him to do so.[3] Judge Saucedo pointed out that the anonymous letter had been sent to her husband’s work. Tovar was shocked and began crying. She said she needed to report the letter to court administration or law enforcement and she had no idea who would do this. The judge responded that she could not “ ‘tell anybody’ ” about the letter, including court reporter Werth. He said Tovar could get fired if she reported the letter, and that the letter had to be from somebody in law enforcement because law enforcement would be the only possible source for his home address.
When Tovar continued to insist the letter needed to be reported, the judge said he would call Tovar’s husband’s employer and tell them that it was a *CJP Supp. 10 jury letter or jury certificate sent in error and he was calling on behalf of the court, and that he would ensure the letter would be intercepted if she trusted him completely. Judge Saucedo kept the letter in his chambers and told Tovar to meet him in a conference room at noon in the court’s law library. About one or two hours later, during courtroom proceedings, Judge Saucedo handed Tovar a note stating he had communicated with someone named “John,” the human resources manager at the hospital where Mr. Tovar worked, and that everything was going to be okay. At noon, Tovar met with Judge Saucedo in the law library conference room he had reserved, located in the basement of the courthouse. Judge Saucedo had reserved the room earlier that morning because it was a “more private setting” than his chambers. During this meeting, Judge Saucedo told Tovar that when he called the hospital, “John” told him the anonymous letter was sitting on his desk and he was wondering who Hilario Tovar was because the name did not sound familiar to him. Judge Saucedo said that “John” shredded the letter during this phone conversation.
In his testimony and in his verified answer to the Notice (Answer), Judge Saucedo acknowledged he had made no attempt to contact the hospital or anyone at Mr. Tovar’s place of employment. The judge testified that he made these false statements to make Tovar “feel better,” an explanation we reject.
During the noon meeting, Judge Saucedo again showed Tovar the anonymous letter and suggested that Knoy wrote it, but Tovar denied that he would have done so. He then said that if Tovar wanted him to help her, she needed to be completely honest with him and tell him everything about her relationship with Knoy. Judge Saucedo wanted to know if she was “intimate” with Knoy, and the nature of their relationship. Tovar responded that she and Knoy were just friends and were no longer romantically involved. She said Knoy was assisting with her sister’s payments for a Jeep that Tovar sometimes drove. Judge Saucedo asked when she last met with Knoy, and Tovar answered that she went to his house for about 30 or 40 minutes after buying the new phone. The judge asked: “ ‘Are you sure you weren’t intimate with him ... at that time?’ ” Tovar said she was not.
Judge Saucedo told Tovar she should no longer take any money from Knoy and that she was to cut off all communication with him. He said he would give her $200 per month to cover the Jeep payments. When Tovar said she did not want him to do this, Judge Saucedo said she needed to take the money if she wanted his help. At this point in the conversation, both Judge Saucedo and Tovar were crying. When Tovar again said the letter should be turned over to court administration, Judge Saucedo responded that no one was to know about the letter and that Tovar just needed to trust him completely. Judge Saucedo hugged her at the end of the meeting.
*CJP Supp. 11 E. Gifts, Favors, and Communications with Tovar: September 19 to November 15
1. Cash and Statement Regarding Assistance from the Judge ’s Brother
The next day, Judge Saucedo left $200 cash in an envelope on Tovar’s desk. Tovar said she did not need the money, but Judge Saucedo insisted.
The following day, Friday, September 20, when Tovar was finished with her work at about 4:45 or 4:50 p.m., Judge Saucedo asked her to come into his chambers and close the door. Judge Saucedo said he wanted to talk to her about what had happened and that he “didn’t have anybody else to talk to” about the anonymous letter. He said he continued to believe Knoy wrote the letter and he could get Knoy fired because he (the judge) was a very powerful man. Judge Saucedo was crying and said he was upset and hurt because he cared about Tovar. Tovar responded that she wished she could just report the letter to court administration and that she did not feel comfortable. Judge Saucedo told her not to do this because she might get in trouble. Tovar said that Judge Saucedo hugged her as she left the chambers, which made her feel uncomfortable.
On Monday morning, Judge Saucedo gave Tovar a typewritten note with his brother’s name and phone number. According to Tovar, Judge Saucedo said that over the weekend he had been thinking about his statement to Tovar that he would take care of her, and then started thinking about what if something happened to him. He said he had talked with his brother (a physician), and told his brother everything and that she should call his brother if she ever needed anything.
Judge Saucedo testified that he gave Tovar his brother’s contact information to assist her and her son with medical issues. However, he previously told the investigator hired by the Judicial Council, Lisa Buehler, he wanted Tovar “ ‘to understand in order to break the financial relationship with J.K. ... she could continue with [Judge Saucedo’s] brother to help if [Judge Saucedo] couldn’t do it.’ ” We reject the judge’s testimony concerning this conversation with Tovar based on his prior inconsistent statements and our general credibility determinations as discussed later in this decision.
2. Legal Assistance for Tovar’s Son
Later that same Monday, Judge Saucedo gave Tovar a letter written to her teenage son concerning an alcohol-related citation he had received. The lengthy letter was entitled “Privileged and Confidential Communication.” The *CJP Supp. 12 first paragraph states: “I am Valeriano Saucedo, a California Superior Court Judge sitting in Department 6 in Tulare County. Your mother, Priscilla, is my clerk and friend. I write for two reasons: One, to give you legal advice at your mother’s request on your recent citation alleging a violahon of Business and Professions Code section 25667 [minor in possession of alcohol in a public place]. Two, to give you a personal and judicial perspechve which hopefully will enable you to gain from this experience and to better exercise leadership in your home, school, baseball team and community.”
In the next several pages, Judge Saucedo detailed the potential penalties for the offense, identified several potential defenses to the charge, and said that if a further notice to appear was issued, he would ‘“find out and let [Tovar’s son] know how Fresno County handles minor in possession of alcohol cases whether filed as infractions or misdemeanors.” Judge Saucedo additionally commented on Tovar’s work at the court, stating she is ‘“hardworking” and “brilliant,” and he “trust[s] her implicitly and completely.” Judge Saucedo concluded the letter by discussing his own background and the importance of working hard to “realize your dreams.” He also stated: “You may contact me at my chambers in court or on my personal cell [phone number] to discuss the legal advice in this letter and to arrange to meet.”
Judge Saucedo told Tovar she should give the letter to her son that evening, and she should text him back to let him know what her son’s thoughts were regarding the letter. There was no follow-up on the letter because Tovar’s son never received a notice to appear for the hcketed offense. Although Judge Saucedo initially testified that he wrote “Privileged and Confidential” on the letter because it was meant for the parents, he later acknowledged, “in retrospect,” it referred to an attorney-client privilege. He testified that an attorney-client relationship had never been formed, although he ultimately admitted the letter contained legal advice.
3. Flowers and More Cash Gifts
On September 25, when Tovar came into work, she found flowers on her desk that had been delivered to her the day before. The card was unsigned and stated “NEW DAY, NEW WEEK, NEW BEGINNING.” Tovar had no idea who had sent her the flowers, but later that day Judge Saucedo called her into chambers and said he had sent them to her. Judge Saucedo told her to tell everyone they were from her husband. Judge Saucedo later gave Tovar a typed note stating: “As for the flowers, simply say that things are wonderful between you and Lalo and that Lalo sent the flowers. (A little white lie won’t hurt anyone.) Word will get out and Jeremy [Knoy] will get the clear message. Remember always operate from a position of strength.”
*CJP Supp. 13 The florist’s order form contained Judge Saucedo’s request that his identity not be revealed and stated: “Arrangement small and understated. For her desk.” (Some capitalization omitted.)
Later that day, Tovar told Judge Saucedo she did not feel comfortable with him sending her flowers and helping her financially and that although she appreciated it, she did not need help. Judge Saucedo responded that they did not have anyone else to talk to about the letter, that if he told his wife she would ask why he did not report it to court administration, and that he thought of Tovar as a daughter so she should trust him.
Judge Saucedo acknowledged that he told Tovar to lie about who sent the flowers. He testified that he sent the flowers on September 24 in memory of the anniversary of Tovar’s brother’s death. Tovar testified that her brother passed away on October 8, 1990. In prehearing documents, the judge misidentified the date the flowers were sent as October 1, closer to the anniversary of Tovar’s brother’s death. We reject the judge’s purported reason for sending the flowers, and instead conclude, as did the masters, that the flowers were sent in furtherance of his efforts to establish a closer personal relationship with Tovar. Had the flowers been sent in memory of Tovar’s brother, there would have been no need to conceal that he sent the flowers.
About one or two days later, Judge Saucedo left an envelope with $500 in cash on Tovar’s desk. He told her she should go shopping and she needed to change the way she dressed. Judge Saucedo asked her to send him a photograph of herself while she was shopping.
On Friday, September 27, Judge Saucedo sent Tovar an e-mail with the subject line “Cases” stating, “May we spend a few minutes talking before you leave.” Tovar responded: “I can[’]t today, I am meeting my sisters for dinner.” Tovar was not actually meeting her sisters, but she did not want to talk to him because she was feeling uncomfortable with their interactions. Later that evening and over the weekend, Judge Saucedo sent Tovar several texts in which he asked whether she had continuing contact with Knoy and whether she had gone shopping with the money he had given her.
4. September 30 Note to Tovar
On Monday, September 30, Judge Saucedo handed Tovar a one-page typewritten note while she was at her clerk’s desk in the courtroom (the September 30 note). The note stated:
“I support you completely and unequivocally in all of your endeavors.
*CJP Supp. 14 “Reflecting back on this last week, I am concerned that I have not yet fully earned your complete trust and confidence. Two examples come to mind. Last week, until I probed, you did not voluntarily tell me that you only had $10.00 in your checking account. Clearly, this was not enough money to make it through the rest of the week and weekend until Tuesday of this week, your payday. You should have voluntarily told me. Once I learned of your financial pressure, I initially gifted you $200 and then $500. I was happy to do so but what concerned me is that you did not voluntarily tell me. The second example is Saturday when I asked you about Jeremy [Knoy]. I again felt like I probed when we had agreed that you would voluntarily let me know if he contacted you about the loan payment.
“I truly want to earn your trust and feel badly that I have not yet done so. What else do I need to do? I voluntarily took a risk to protect you because you have earned my trust and respect. I have no regrets that I took the risk. It was absolutely the right thing to do. You have my utmost respect and trust and always will. I was upset with myself this weekend, notwithstanding your forgiveness, because sometimes I still feel that I am hurting and not helping you enough.
“This month and every month I will gift you $200 for the loan. However, I am happy to meet your other financial needs. As I’ve told you, from here on out, you will no longer have any financial worries. However, you must trust me unconditionally and voluntarily tell me everything. Don’t be like my former clients. They didn’t lie to me. Sometimes they forgot to tell me important things. Don’t feel embarrassed or like a burden. I can handle anything.
“Looking at the future, I want to earn your complete trust and have you voluntarily tell me what is going on in your life. I am willing to do anything to earn your trust and confidence. I want to support your every endeavor but I cannot know your endeavors unless you tell me. In this connection, I find texting is fine but I find these notes and form of communication unsatisfying and incomplete. They do not fully inform me on what is going on. I prefer to talk to you and would like to know whether you wish to talk and when. Sometimes I feel like you would prefer to avoid me altogether and not talk to me. Perhaps, you don’t even like me, want to talk to me or have me involved. I hope not. Let’s work on these issues together, planning for your financial future (including a two seater—although you seem skeptical about this promise). As you know, I do not make promises I cannot keep. Frankly, my biggest concern is how you would explain a two seater gift to Lalo. (By the way, what did you say and what did he say about the flowers? Just curious.)
*CJP Supp. 15 “Finally, I, too, am human and have an ego. Feel free, if you wish, to compliment me if you like things I do or wear, or, if you wish, you may treat me like the Maytag repair man.
“Please respond. Always your genuine friend and supporter.”
Tovar felt uncomfortable and disgusted by the letter, particularly the portion of the letter where he told her to feel free to compliment him on things he does or wears.
After Tovar read the note, Judge Saucedo asked her to return it to him, but she did not immediately give it back and instead covertly made a copy. When she returned the original to him toward the end of the day, Judge Saucedo asked if she had a response to the letter. She thanked him, but said she did not want any more help from him and she did not want him to give her any more money. Judge Saucedo responded in an angry manner, stating, “ ‘What do you mean you don’t want my help anymore? So you mean the [anonymous] letter is true? So is it true about you and Jeremy ? Maybe your husband does need to know about the [anonymous] letter.’ ” Judge Saucedo then left the courtroom and Tovar heard a door slam near the stairwell. Judge Saucedo denied making these statements or slamming the door. As did the masters, we find Tovar’s version of the interaction credible.
5. Tovar Confides in Werth
Tovar testified that the judge’s conduct was scaring her and she decided she needed advice from Werth (the court reporter). After her interaction with Judge Saucedo on September 30, Tovar told Werth about the anonymous letter and showed her the September 30 note. According to Tovar, Werth responded: “ ‘This ... is wrong. This is not right. Something is going on with him.’ ” Werth told Tovar she needed to get a copy of the anonymous letter. Tovar said she thought it was in Judge Saucedo’s desk and she would attempt to obtain a copy later that day. Werth told Tovar that she would text her when Judge Saucedo left for the day, so Tovar would know it would be safe to search his office for the letter.
At about 6:20 that evening, Tovar texted Werth to let her know she was “snooping” in Judge Saucedo’s office, and was worried she was “going to be in big trouble.” After Tovar found the anonymous letter, she texted Werth with a photograph of the letter and then made a copy of the letter and returned the original to Judge Saucedo’s desk. A few hours later, Tovar sent a text to Werth stating that Judge Saucedo had sent a text message to her “apologizing” for his behavior earlier in the day.
The next day, Tovar showed Werth a copy of the anonymous letter. Tovar testified that Werth immediately responded that Judge Saucedo wrote the *CJP Supp. 16 letter, and that Werth knew this based on working with him for “all these years, reading his pleadings and his rulings . . . .” When Tovar said she did not believe Judge Saucedo could have written it, Werth said she was “ ‘positive. I know him too well.’ ”
At the hearing before the special masters, Werth denied stating or believing that Judge Saucedo was the author of the anonymous letter. The masters rejected this testimony, noting that Judicial Council investigator Buehler testified that Werth told her she thought the judge wrote the letter, that important parts of Werth’s testimony were contradicted by her own text messages written as events were unfolding, and that she still worked for Judge Saucedo at the time of her testimony (and had worked for him since 2001). We find that Werth told Tovar she believed the judge was the author of the anonymous letter.
6. Assistance with Tovar’s Car Problems
On October 1, Judge Saucedo called Tovar into his chambers. Judge Saucedo apologized for his behavior the day before and said it would not happen again. He also indicated he had overheard her talking about car problems and asked why she had not taken her car to a mechanic. The judge offered to take her car to his mechanic. Tovar agreed to meet Judge Saucedo the next day at his mechanic’s shop.
That evening, Werth and Tovar had the following text message exchange[4]:
“[Werth:] You really think it’s a good idea to drop your car off tomorrow and be further into debt with him?
“[Tovar:] I know I’ve been thinking about it.
“[Werth:] Totally up to you ...[.] But I think you’re sending [some] mixed messages ... in that you tell him you’re good, no more help, then you take it . . . [.] He says why won’t you be my friend, etc. . . . See what I mean?
“[Tovar:] So what do I say .... [¶] I should have had you pick me up. I will cancel the [appointment].
“[Werth:] [Y]ou do what you think is right, I don’t want to tell you what to do ... .
*CJP Supp. 17 “[Tovar:] Ugh.
“[Werth:] I’m sorry, I know it’s difficult ...[.] But the thing is, you can’t have it both ways .... Can’t say no, I don’t need your help anymore, basically stop bugging me then turn around and say I need help with my car .... He’s getting mixed signals. . . .
“[Tovar:] I didn’t ask for help again he would not take no. I’m going to pay for it. Not going to say anything out loud any more. I’m seriously thinking of [asking] to be moved. Maybe it was meant for me to its time.
“[Werth:] I’m sorry you feel that way and I hope you reconsider that decision .... I know you didn’t ask for any of this to happen! This is NOT your fault! I hope you KNOW that and BELIEVE it ... .
“[Tovar:] I do but I’m having to watch every conversation I have and it’s not fair. And I don’t like that.
“[Werth:] I can imagine how you must feel, and you’re right, it’s not fair .... Let’s brainstorm more tomorrow .... We’re gonna figure this thing out! . . .”
The next morning, Tovar met Judge Saucedo at his mechanic’s shop and dropped off her car. While at work, Judge Saucedo twice e-mailed Tovar about the car (he titled one of the e-mails “Case Files”). Judge Saucedo paid the total bill of approximately $533.
7. More Notes, Cash Gifts
In early October, Judge Saucedo handed Tovar a note while she was at her clerk’s desk in the courtroom stating, “Don’t share with anyone any information. I assume you have not told anyone about Jeremy and the letter. Correct?” Tovar indicated that she had not told anyone. She then secretly made a copy of the note. Pursuant to Judge Saucedo’s explicit directions, she returned the note to him. She testified that he wanted her to give back every note and letter he gave her so he could shred them.
In mid-October, Judge Saucedo sent Tovar numerous text messages, often during the evening hours. Tovar sometimes responded to the texts. At about this time, Judge Saucedo asked Tovar if she had been shopping and Tovar said she could not afford to buy anything. The judge then asked for her bank account number so he could put money in her savings account. When she said she did not need the money, Judge Saucedo told her she needed to trust him. Tovar gave him her bank account number.
*CJP Supp. 18 8. Disneyland Trip for Tovar’s Family
At some point in October, Tovar and Velasquez were talking at their desks and Tovar said she had always wanted to go to Disneyland for Christmas. Judge Saucedo then called Tovar into chambers and asked why Tovar did not plan a trip to Disneyland for Christmas. She said she did not have the time or money to go on that type of a trip. Judge Saucedo responded that she was going and it would be his gift to her. Tovar testified that when she told him she did not want to accept the gift, the judge insisted and said, “ ‘Do you want your husband to find out about the [anonymous] letter?’ ”
According to Judge Saucedo, Tovar asked him to pay for the Disneyland trip and he agreed. As did the masters, we find Tovar to be credible and adopt her version of the conversation.
Soon after, Judge Saucedo and Tovar met at an American Automobile Association (AAA) office during the lunch hour to discuss arrangements for the Disneyland trip. Judge Saucedo ultimately purchased a Disneyland vacation trip package for Tovar’s family ($1,862), and then purchased an additional vacation package for Tovar’s sister and her family ($1,340). Judge Saucedo promised to pay for all trip expenses, including meals and souvenirs. Judge Saucedo told her to tell her family she was paying for the trip with overtime earnings, and not to tell anyone he was paying for the trip. She complied. The AAA trip documentation states Judge Saucedo requested the travel agent “not to have any [additional] contact” with him regarding the trip purchase.
Shortly after this lunch meeting, Judge Saucedo gave Tovar a note (AAA note) attaching a deposit slip showing he had deposited $500 into her bank account and asking for his “texting privileges” to be “reinstated.” The note read:
“AAA
“Here is your temporary AAA card. You must sign and keep the temporary card. Keep it with you. The hard plastic card along with your free gift, the movie Turbo, will be mailed to your Selma address. We should upgrade the card to a premium level in about 90 days. This will give you better protection. Keep in mind that the card runs with you not your car. This means that it will provide you with personal protection no matter which car you are in.
“CitiBank
*CJP Supp. 19 “Attached is proof of deposit for $500. The funds are available immediately. The teller said that you simply needed to get on line and confirm that the deposit was made. Please confirm that the deposit was credited. Enjoy!!
“Roseville
“Be careful if you drive to Roseville. It is quite far and you should take appropriate precautions to be safe. You know this already and do not need me to tell you. However, I will worry about you. As always, I am ready to help you with anything. If your car breaks down and AAA is not sufficient or you need to get lodging and cannot afford it, call me. Remember—anything.
“Texting
“With your permission, I would like to have my texting privileges reinstated. I promise to use greater discretion and not make you feel as if I am being controlling. As I have explained, that is not my intention. I simply enjoy knowing that you are happy enjoying your new financial freedom. If you feel that this is not a good idea, let me know. I will understand. I appreciate your candor.
“Have a wonderful weekend and I hope you feel better.”
Tovar testified she asked him on several different occasions not to text her. She said he was doing it “a lot, all the time” and he would “get upset if [she] wouldn’t text him back right away or text him back at all.” She repeatedly told him the texting was too much and she did not feel comfortable with it. Judge Saucedo concedes he sent Tovar about 445 texts during the two-month period in question.
9. Planning Purchase of BMW, Offer to Pay for Body Sculpting, and Further Efforts to Create Closer Relationship
On October 28, Judge Saucedo texted Tovar numerous times asking whether she and her sister were happy, and mentioned a car that he might be buying for her. Tovar told him she appreciated his offer, but did not need a new car.
On October 29, in the morning before work, Judge Saucedo sent several texts to Tovar. At 7:27 a.m., he wrote: “Good morning. Follow up to our conversation. Every morning wake up feeling wonderful and beautiful. No pressure, no worries.”
Six minutes later, he wrote: “You do not need body sculping. You are gorgeous and in fine shape as you are. However if it would help your self esteem, let’s discuss it in March or April. We have lots on our plate right now, Disney, the car, etc.”
*CJP Supp. 20 Three minutes later, he wrote: “Lalo [Tovar’s husband] should not criticize you unless he is willing to pay for your body sculptng. I am willing to pay.”
One minute later, he wrote: “I am working on a Disney budget.”
Tovar did not initiate or respond to these early morning messages. According to Tovar, the topic of body sculpting was brought up by Judge Saucedo sometime before these text messages were sent. She testified she was having a conversation with other employees in the common area about plastic surgery and a few minutes later the judge called her into his chambers and started talking about body sculpting. She told him that she did not want to do that.
Later on October 29, during working hours, Judge Saucedo sent Tovar several text messages about the Disneyland trip and a possible new car for Tovar. Tovar responded that she told her daughters about Disneyland, and that she “looked” at the car (apparently on the Internet), and that it was “nice,” but if “it doesn’t work out that’s ok.”
That same day and into the evening, the two had the following text message exchange:
At 1:15 p.m., Judge Saucedo wrote to Tovar: “I am very excited and happy for you. I understand about the car but I also do not like failure. Our friendship makes me happy. Seeing you happy and self assured also makes me happy.”
Six minutes later, Judge Saucedo wrote to Tovar: “Did everything go well at your medical appointment?”
At 4:41 p.m., Judge Saucedo wrote to Tovar: “You seemed aloof and unhappy today. Everything okay?”
Thirty minutes later, Tovar responded: “A lot of work ...[.] I’m behind so I’m feeling overwhelmed is all. It was nice not having to be in court is all.”
At 5:21 p.m., Judge Saucedo wrote to Tovar: “I understand. Is there anything I can do? I try to brighten up your day with positive thoughts. Everyday love, kindness and respect.”
Four minutes later, Judge Saucedo wrote to Tovar: “I truly appreciate everything you do. Too bad we can’t talk very much. I had a wonderful conversation with my brother about you. Just doing financial planning. You don’t know how well you are covered.”
*CJP Supp. 21 Fourteen minutes later, Tovar replied: “Not to be picky but on the car issue I wouldn’t mind a 4 seater sports car ...[.] I don’t mind a 2 door convertible ...[.] Hope that’s not rude.”
Nineteen minutes later, Judge Saucedo responded: “Not rude at all. BMW makes a beautiful 4 seater convertible. I found one in LA and another in SLO but did not think it would work. It is a rag top. Did you have a particular model in mind?”
Two minutes later, Judge Saucedo wrote: “I want you to be happy and I don’t want to get a car that won’t work for you. I am talking to three dealers. Hope to make this happen soon. As you know, I am serious about everything I do.”
Tovar testified that she decided to accept his offer after he repeatedly pressed the issue. Although he wanted to buy her a two-seater, she told him she would prefer a four-door car because of her family.
The next morning, Judge Saucedo sent Tovar text messages about a meeting at the AAA office over the noon hour regarding the Disneyland trip. When Tovar said she did not have much time, Judge Saucedo texted her: “I understand but I detect some attitude. There are a few things I would like to talk to y[o]u about but sounds like you may not want to talk to me. Is everything truly okay?”
As they were leaving one of their AAA appointments, Judge Saucedo told Tovar he wanted to have more contact with her. Tovar responded she did not feel comfortable with that, and asked him to limit his texting.
Later that afternoon, Judge Saucedo sent Tovar several texts about the car he intended to buy for her. The two then exchanged several text messages in the early evening hours (from about 4:10 p.m. to 8:30 p.m.). The messages were as follows:
“[Judge Saucedo:] It’s silly but still feeling under appreciated. It’s silly because you don’t owe me anything. I am doing this for my own soul because it makes me happy.
“[Tovar:] I’m not doing anything different and I’m not sure why you are feeling that way ...[.] I truelly do appreciate everything.
“[Judge Saucedo:] I am feeling out of balance. I appreciate you are not doing anything different. Feeling today like a one sided friendship. My feelings are momentary and episodic. I’ll be fine. Everything is on line and *CJP Supp. 22 on course. No change. Just expressing my feelings. Said I am always honest in my feelings and dealings with everyone.
“[Judge Saucedo:] Just a silly man.
“[Judge Saucedo:] I need to refle[c]t and strike a balance. Embarrassed about my feelings.[5]
“[Judge Saucedo:] The sedan is a silver 4 door, sun roof, blue tooth, black interior. Some wear and tear but not bad. 80,000 miles. . . .
“[Judge Saucedo:] Did you hook up with Lalo in Visalia?
“[Tovar:] I did not meet Lalo. He decided not to come up so I went home.
“[Judge Saucedo:] Ed [the BMW salesperson] has made a very generous offer on the sedan. $15 [,000] out the door. We need to think about this one. If I can forward his email you will see the offer.
“[Tovar:] When can I see the car?
“[Judge Saucedo:] When would you like to see it?
“[Tovar:] Maybe tomorrow at lunch. . . .
“[Judge Saucedo:] Did y[o]u receive the [e-mailed] offer [regarding the sedan vehicle] ?
“[Tovar:] Busy with [my youngest son]. So I would have a car payment?
“[Judge Saucedo:] Absolutely correct. I would make all of the payments. You would be responsible for an increase, if any, for insurance but I would certainly help. Remember this would be my gift to you. We would work out other reasonable accommodations. Lor example, if you decided you no longer wanted the car or wished to sell it we would decide what to do with the proceeds. It would be yours as long as you and only you owned it.
“[Judge Saucedo]: Have I not taken care of you without asking anything in return? Things would not change. You would just have to put up with my silliness like today.
*CJP Supp. 23 “[Judge Saucedo:] You could have a new car within days.”
When Tovar did not respond to this last text, at about 9:30 p.m., Judge Saucedo sent Tovar a text asking for feedback. The two then had the following text message exchange during the next 30 minutes:
“[Tovar:] Yes was watching the game with my famil[y] and also thinking about the car. The issue with that is the payments I know you said you would take care of it and I trust you but my issue is its not free and clear, something hanging over my head to worry about. Just like today you felt unappreciated I can’t always text back immediately, I’m not always going to be in the best mood and that bothers you, I am simply being me. This is unexpected and a lot to think about. Please don’t take it the wrong way.
“[Judge Saucedo:] I understand. As you said, we are human. It is always question of trust. I hope you trust me and that I have done enough to earn your trust. I am a stupid and silly man but I would never hurt you financially or otherwise. I would never exploit you.
“[Judge Saucedo:] I would also not want you to be nice simply because of our financial arrangement. That’s why I sometimes ask whether you like me and respect me. It is important to have a friendship that extends b[e]yond a financial connection. I will respect any decision you make.
“[Tovar:] I respect you and our friendship way beyond financial reasons I’ve never even thought or think about that sorry this has crossed your mind a couple of times I’m hurt because you bring that up often. I’ve always been respectful to you even before your offer. Good night Lalo is now questioning me about who I’m texting this late.”
Early the next morning (before 8:00 a.m.) on October 31, Judge Saucedo sent Tovar three additional messages (there is no indication that Tovar responded to any of these messages):
“[Judge Saucedo:] True friends forgive each other for their mistakes and failures. I sincerely apologize for everything I said or did yesterday that was offensive or hurtful. I should not have communicated while off balance. Those are my worst moments. I wish to continue our friendship. I hope you will continue on this journey. In good faith, check your savings balance later today. Let me know if our friendship continues.
“[Judge Saucedo:] Texting is imperfect. Like the AAA incident, you do n[o]t know the entire picture. The car offer is part of an overall financial plan annualized over the next year. You will own the car free and clear in one *CJP Supp. 24 year, not four years as projected. The expenses over the next year are: 2.4 for the jeep, 12 for savings and 12 for the car for a total of $26,400. This does not include other possible special expenses such as trips to see [your son] play [baseball] next summer or to visit him in college, body sculpting, etc.
“[Judge Saucedo:] In sum, I am committed to helping you financially if you wish. I will make mistakes and so will you including both of us being moody at times. But the test of friendship is overcoming these minor differences and reaching a better understanding. We can not walk away over a simple misunderstanding. My goal is to help you succeed in your marriage and personal and professional life.
“[Judge Saucedo:] Let me know how you wish to proceed.”
At noon, Tovar went with Judge Saucedo to the BMW dealership. After Tovar test drove a car, Judge Saucedo asked the salesperson to allow him to have a private conversation with Tovar.
They met in a private staff break room. Judge Saucedo told Tovar to tell her husband that the car was Judge Saucedo’s wife’s old car. He also asked Tovar what she thought about everything. Tovar told him she appreciated it, and “was in shock.” Judge Saucedo said he wanted to have more communication with her, and that he wanted Tovar to “tell him . . . how [she] felt all the time, what [she] was thinking, what [her] plans were.” He wanted “to know [her] happiness; he wanted [her] to be emotional with him.” Tovar told Judge Saucedo the texting “was becoming too much,” and that she was not comfortable with having an emotional relationship with him. Tovar asked whether Judge Saucedo “was asking [her] for an affair, emotional affair, and he said . . . no.” At that point, the salesperson came in and said the employees needed to use the break room, and Judge Saucedo became angry stating, “ ‘I’m not done here.’ ”
Less than one hour after returning to work, Judge Saucedo sent the following text message to Tovar: “This is the most difficult message I have ever written. We will always be friends and my financial commitment to you will continue unchanged. But I’m done. I cannot overcome my embarrassment over my childish, stupid and silly behavior. You owe me nothing, including emotional support. This is my last text. I will also not call you. You may text or call if you like. I am angry with myself.”
Six minutes later, Judge Saucedo sent another message to Tovar: “Here’s the schedule. I will deposit into your account at the beginning of each month and in the middle for the jeep payment. You may also let me know of other needs. I told you I would never hurt you but it is obvious my behavior is *CJP Supp. 25 negatively impacting you. If you want the car it is yours. We simply need to wor[k] out the details. Please forgive me and continue to be my friend on your terms. Check your account.”
Seven minutes later, Tovar responded back: “I would love the car, don’t be upset, it will all be ok. I will check my account in a few minutes.”
Five hundred dollars was deposited into Tovar’s bank account at 2:09 p.m. that same day.
Later that evening, Judge Saucedo began a text message exchange with Tovar stating: “I feel stupid for breaking my rule. Critical development on the car. Must talk tonight. Teaching class. Can you call me around 8:15. Critical!!” Tovar responded that she would try to call. About one hour later, Judge Saucedo texted back: “Don’t call. I have slowed down the process. If we want the car and put down a nonrefundable deposit of 1000, Ed will hold the car for 10 days. This is perfect. We can get everything lined up and not rush through this. We must be certain that we want this car with this deal or, if we don’t follow through we lose the $1000. Are you sure you want this car?”
Approximately one hour later, Judge Saucedo sent Tovar another message stating he was “doing this” because he “care[d] about [her] and [her] family” and wanted her “in a safe car.” Judge Saucedo then sent another message stating, “This car will be yours,” and Tovar responded that she “agree[d]” with the plan.
The next day, Tovar and Judge Saucedo returned to the dealership for Judge Saucedo to make a $1,000 down payment. According to Tovar, as they were walking out of the dealership in the parking lot, Judge Saucedo brought up the issue of a “romantic relationship.” Tovar testified: “[Judge Saucedo] said that he had a conversation with his accountant . . . about having to cash stocks in to get the car or something like that, and his accountant asked him . . . who was I. Who buys a car for a person? Who gives them a Disneyland trip? And was he sure I wasn’t more than just a special friend; was I his mistress? . . . [¶] And then [Judge Saucedo] said that ... if my husband didn’t find out and his wife didn’t find out, if he would consider having a romantic relationship with me. And I looked at him, and I said, ‘What?’ And he says ‘If they wouldn’t know about it, would you have a romantic relationship with me ?’ And I said, ‘Is that what this is all about?’ I said, ‘No I wouldn’t.’ And he says, ‘Why? Because of my age?’ I said: ‘I’ve never looked at you like that. . . . I’m married, and you’re my judge. I work for you. I would never look at you this way. And if this is what this is all about, then I don’t want the car; just forget it.’ ”
*CJP Supp. 26 Judge Saucedo responded by hugging her and saying, “ ‘No. Okay. I’m sorry. I’m sorry. The car is yours.’ ”
Judge Saucedo denied this conversation occurred. Based on the credibility determinations of the masters, which we have adopted, we find Tovar’s recollection of the conversation to be credible.
10. Text Messages About Relationship Status, and Judge ’s Claimed Suicide Attempt
The next day, Saturday, November 2, Tovar and Judge Saucedo texted throughout the day as follows:
“[Tovar:] Hope your game of golf was good. I had a question about the tint on the car. I called Ed but he’s not returning my call. I wanted to make sure it was dark. Sorry to bother[.]
“[Judge Saucedo:] Tessie [Velasquez] is coming over to my house.
“[Tovar:] How nice.
“[Judge Saucedo:] I was busy with Tessie and did not have a chance to directly respond to your earlier text. She might be next. Thank you for asking about golf. It’s always wonderful. I truly enjoy it. . . . Your texts are never a bother. I have information from Ed about the molding and tinting. Your comment begs the question. You are focused on the end result and not the process. The process is more important.
“[Judge Saucedo:] Covered by accountant-client privilege, I spoke with my accountant again. He said I didn’t realize I had already been seriously hurt and will only experience more hurt in the future. After I told him about the $5 in savings and the car, he said ‘wow and not even a thank you’. No texting, no calls, a few hurried conversations, you initiate all communication, ‘what’s in it for you’ he commented. [¶] Not even a text or a call on whether the car closed. It’s [a] friendship in your mind and at most, a one sided friendship he said. Think about it he asked. I spoke to him because I needed an objective assessment. Is his assessment right?
“[Tovar:] I thought we talked about all this. I’m not sure where your going with this issue. We are friends always were and as far as I see we will be. I’m thankful and appreciate everything. I don’t know what you mean when you say hurt I have never hurt you. Really stressing me with all this.
“[Judge Saucedo:] I shared with you the conversation with my accountant. I wanted reassurance everything is fine and he is wrong. It is not a challenge *CJP Supp. 27 of your values. I appreciate this causes stress but I too stressed. I am about to gift you $15 and he is right in some respects. You texted about the tinting but never asked either yesterday or today whether the deal c[l]osed or any other details. I understand you are thankful but it would be so nice to receive a simple ‘thank you’ or statement about how this feels or how excited you are. Simple things make a difference. Love, kindness and respect everyday.
“[Judge Saucedo:] Where is this going? You will have a beautiful car before or on or about November 12. That’s where this is going. [¶] I promised it and I deliver on my promises. It’s that simple.
“[Tovar:] I thought it was done or closed sorry. I’m excited but then when I get texts like the one Earlier from you it makes me stress. I didn’t know you needed reassurance. ... I was in a great mood all day. You know I’m super excited a car and a trip who gets that. . . .
“[Judge Saucedo:] How would I know you were in a great mood today without you telling me? How would I know you are super excited without you telling me? T[h]at’s the point. You know knowing you are happy makes me happy. It’s the mental part that is important to me. Or as you describe it, the emotional part.
“[Judge Saucedo:] Aren’t you interested in the final details?
“[Judge Saucedo:] I want you to savor the moment. It real now. You did not believe me when I first broached the subject. You wrote flowers, a car? Because you did not believe. Now the moment is here and I want you to reflect on the journey and acknowledge it has been great.
“[Judge Saucedo:] Feedback? Comments? My accountant is right—texting is a wholly unsatisfactory way of communicating.”
The next day, Judge Saucedo sent two texts to Tovar in which he continued to discuss his relationship with Tovar:
“[Judge Saucedo:] After reflection, I understand it. You think of me as an ordinary friend like Kim [Werth] or others. Indeed, you have said in the past you want to go back the way it was. But I am not an ordinary friend. As you said ‘a car and a trip who gets that’. No other ordinary friend h[a]s in the past given you or will give you in the future a valuable car, a trip for you and your sister and your families or a commitment to support you financially. Is this what an ordinary friend does? No. Only a special friend does this. An ordinary friend would provide only moral support. If you want me to be an ordinary friend like I was before September, I will provide only moral *CJP Supp. 28 support. But if you want me for a special friend, everything is on line with full financial and moral support going forward. Special friend means you want to make time and effort to share thoughts and experiences with me.
“[Judge Saucedo]: These are my feelings. I am always honest and truthful. Am I an ordinary or special friend?”
Less than 10 minutes later, Tovar responded by text stating: “Correct me if I’m wrong, are you once again asking for an emotional affair?” Judge Saucedo responded, “Absolutely not” and “Why do you ask that q[u]estion?” Over the next hour, Judge Saucedo and Tovar had an exchange of texts that began with Tovar’s statement that she thought it was “time” to tell her husband “absolutely everything” about Judge Saucedo’s conduct and she could not handle it anymore:
“[Tovar:] That’s what you mean when you say special friend? I think it’s time I tell Lalo absolutely everything from the letter, financial gifts, the trips, the car, I can’t handle it anymore, I’m shaking, I’m sick, I’m an emotional mess and I have not bothered anyone in my life. I can’t handle this no longer. The lies to my family and friends its not worth how I’m feeling right now I can’t focus on my family since your texts yesterday.
“[Tovar:] And they don’t deserve this. I will also seek a therapist tomorrow just so you know. This has gone bad.
“[Judge Saucedo:] Please calm down and think about this. Think before you act. What should I tell Ed [the BMW salesperson] ?
“[Judge Saucedo:] Please think and slow things down.
“[Judge Saucedo:] Please call me.
“[Judge Saucedo:] Based on your text, I will resign as Ju[d]ge tomorrow. My career is toast. We can still save this. Please call.”
More than three hours later, Tovar texted Judge Saucedo demanding that he “follow through” with his promised gifts of a Disneyland vacation and a car: “I take it that you will follow through with the cost of my family trip and the car, I will not come out of this as a failure without either. I do not want to hear anymore of our relationship status, Not one word. I am an emotional wreck as I text this. I will consider you a friend and nothing else just as I consider ‘Kim’. I am still going to seek a therapist as damage has been done. I did not think this was going to end up this way.”
*CJP Supp. 29 Judge Saucedo responded, “Call me please,” and Tovar countered with, “No phone calls. No more texts after this. Please.” Judge Saucedo wrote: “I understand but I am concerned about my career. It is toast unless you talk to me. In the garage committing suicide. Have the red car running with the door down. Please call.” Tovar replied she would call 911, and then she said, “I’m not going to say anything. If you follow through with what I asked.”[6] She told him to “stop calling.” Judge Saucedo then wrote: “Thank y[o]u for sparing my life and career. Absolutely I will follow through on the car, trip, and not another word as you request. Your text was timely because I was ending my life. Thank you for the gift of life.”
11. Discussions of Judge ’s Resignation, Continuation of Gifts, Involvement of Werth, and Tovar’s Request for Promised Expense Money for Disneyland Trip
The next day, Monday, November 4, Judge Saucedo called Tovar into his chambers and told her he had given a letter of resignation to the court’s executive secretary, Ellen Kennedy.[7]
Two days later, Judge Saucedo paid the remaining purchase price ($14,000) for the BMW automobile, and registered the vehicle in Tovar’s name.
On November 12, Bailiff Eddie Cibrian began talking with Tovar in the courtroom. Judge Saucedo came into the courtroom and told Cibrian to leave and that he needed to speak with Tovar. Judge Saucedo told Tovar her financial privileges were reinstated and that he had made a deposit in her account. Tovar became very upset and responded: “ ‘Why? Why did you do that? You said you were done.’ ” Later that day, Judge Saucedo deposited $200 into Tovar’s bank account.
Two days later, Tovar sent a text to Werth saying: “I’m sick of all this .... [W]hy doesn’t he just leave it alone[;] ... he told Eddie to leave the court room so he could talk[;] . . . why put me in that position and At work .... Just leave it alone already ugh .... It’s sick[.] . . . I’m disgusted[.] ... I want to so bad file harassment but I know that’s bad.”
Later that day, Werth met with Judge Saucedo in an attempt to act as a “go-between” to assist Judge Saucedo and Tovar to repair their relationship. *CJP Supp. 30 In text communications to Tovar shortly before the meeting, Werth said she had “a feeling once [Judge Saucedo] know[s] [the] cats outta the bag, he’ll stop,” but she said she was not sure he would fully “come clean.”
According to Werth, during her ensuing meeting with Judge Saucedo, she told him she knew about the text messages and the gifts, and that Tovar did not want him to send her any more text messages or give her any more money or gifts. Judge Saucedo agreed he would stop texting and there would be no more gifts. Werth learned for the first time that Judge Saucedo had paid for the entire purchase price of the car ($15,000); Tovar had told her he paid only the down payment. Werth had also been unaware Judge Saucedo had been depositing cash directly into Tovar’s account. When Werth confronted Tovar about her failure to tell her the truth about the car purchase and the direct deposits, Tovar began crying and said she had not disclosed this information because she had been too embarrassed.
The next day, Friday, November 15, Judge Saucedo called Werth, Tovar, and Velasquez into his chambers and said he had decided not to retire or resign. He said he had been “going through something,” and that he was better and everything was going to be okay.
F. Last Payment and Judge Accuses Tovar of Extortion
Over the weekend, Tovar was emotionally distraught and decided she could no longer work in Judge Saucedo’s department. On Monday, November 18, she went into Judge Saucedo’s chambers and told him the Disneyland trip was coming up and she would need the trip expense money by Wednesday, November 20, and that she was going to ask for a transfer. She told him she had previously spoken with her supervisors about a transfer and was told she would have to inform him of her request.[8] Judge Saucedo replied, “ ‘Okay.’ ”
Judge Saucedo testified that Tovar came into his chambers and threatened to report him to human resources unless he gave her $8,000 by November 20th. Tovar testified she never threatened Judge Saucedo or asked him for $8,000 or any specific amount. She said she asked him for the Disneyland expense money he had previously promised because without it she would be forced to cancel the trip and explain the situation to her family.
Werth testified that shortly after the judge’s meeting in chambers with Tovar, Judge Saucedo told her that Tovar had demanded $8,000 and threatened to report him to human resources.
*CJP Supp. 31 The next day, during a criminal proceeding, Judge Saucedo handed Tovar a typewritten note in an envelope while she was sitting at her courtroom desk. The note stated:
“Yesterday, November 18, 2013, you threatened to go to HR unless I deposited $8,000.00 into your savings account by Wednesday. The deposit slip for $8,000.00 is enclosed. Please stop. It is done. Enough is enough. It ends today. No more money will be paid out. Confirm through Kim [Werth],
“Penal Code 518.
“Extortion is the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right.
“Penal Code 519.
“Fear, such as will constitute extortion, may be induced by a threat, either: [¶] 1. To do an unlawful injury to the person or property of the individual threatened or of a third person; or, [¶] 2. To accuse the individual threatened, or any relative of his, or member of his family, of any crime; or, [¶] 3. To expose, or to impute to him or them any deformity, disgrace or crime; or, [¶] 4. To expose any secret affecting him or them.”
Attached to the note was a bank deposit slip showing Judge Saucedo had deposited $8,000 into Tovar’s bank account at noon that day.
Tovar said she regretted taking and keeping the money, but at the time she thought if she gave back the $8,000, the judge would say she “was guilty of all of this.” Tovar never returned any of Judge Saucedo’s money or the BMW vehicle.
Regarding Tovar’s alleged demand for $8,000, the masters found that Tovar approached Judge Saucedo to inform him of her intention to seek a transfer from his department and also to ask for the Disneyland money that had been promised to her. However, they found the evidence insufficient to determine whether it was Judge Saucedo or Tovar who suggested the specific $8,000 figure. We agree. However, as stated by the masters, regardless of who raised this $8,000 figure, “the Examiner proved by clear and convincing evidence that Judge Saucedo deposited the $8,000 into Tovar’s bank account for the specific purpose of seeking to ensure Tovar would stay silent about his past behavior.” Judge Saucedo provided no reasonable explanation for his decision not to report the alleged extortion conduct to court administration or law enforcement.
*CJP Supp. 32 On the issue concerning the circumstances in which Judge Saucedo gave Tovar the “extortion” note, Tovar testified that Judge Saucedo handed the note to her while she was sitting at her courtroom clerk’s desk “in the middle of’ a criminal hearing (a factual issue relevant to the legal question of whether the judge was acting in a judicial capacity, as discussed later in this decision). According to Tovar, during the hearing when a public defender, deputy district attorney, an interpreter and Werth were present, Judge Saucedo asked to go off the record, and then handed her the note and asked her to read it. She asked whether he wanted her to read it on the record, and Judge Saucedo said, “No.” Judge Saucedo then went back on the record and finished the proceeding.
Judge Saucedo acknowledged he gave the note to Tovar in the courtroom, but said he handed her the note when the afternoon calendar was completed and the attorneys were picking up their materials and leaving.
The masters found Tovar’s testimony on this issue “was specific, detailed, and made sense given the entire circumstances.” We adopt the masters’ finding that Judge Saucedo gave Tovar the “extortion” note during court proceedings while he was on the bench and in his judicial robe. We further adopt the masters’ finding that Judge Saucedo engaged in this conduct at this time and place for the specific purpose of using his judicial office to intimidate Tovar and ensure her silence.
G. Tovar Reports Judge Saucedo ’s Claimed Improper Conduct
Shortly after she received the November 19 “extortion” note, Tovar filed a request to be transferred out of department 6. While this request was pending, on December 6, Tovar asked to meet with human resources manager Doreen Vitale and, during a highly emotional meeting, summarized the events of the past two months. Vitale took notes, and then typed the notes into a document, which Tovar reviewed and signed. With minor exceptions, the typed summary is consistent with Tovar’s testimony. Tovar told Vitale that Judge Saucedo is very powerful and she was afraid of losing her job and of retaliation. Tovar said she did not report the conduct earlier because she was hoping Judge Saucedo’s conduct would “all stop and go away,” but it did not.
Tovar later filed two administrative claims, one with the Judicial Council and one with the Department of Fair Employment and Housing, alleging Judge Saucedo engaged in unlawful sexual harassment and seeking damages for the harassment. She also filed (or was considering filing) a lawsuit, but she testified she was not sure she was going to maintain this action. She said that other than the hugs, Judge Saucedo’s conduct was not “sexual” in nature.
*CJP Supp. 33 H. Credibility Determinations and Findings on Primary Factual Issues in Dispute
1. Summary
Many of the critical facts underlying the charges are undisputed. Judge Saucedo admits he presented the anonymous letter to Tovar, falsely told her he had contacted her husband’s employer and intercepted the letter, and told her not to tell anyone about the letter. He also admits that between mid-September 2013 and mid-November 2013 he gave Tovar gifts valued in excess of $25,000, sent hundreds of text messages of a personal nature, gave her several notes, and wrote the letter providing legal advice to her son. There are, however, two important factual issues that are strongly disputed. First, Judge Saucedo steadfastly denies he wrote the anonymous letter. Second, he denies that the gifts were given to Tovar as a means to establish a “close” or romantic relationship. Rather, he maintains he was motivated solely by a sincere desire to mentor Tovar and assist her in resolving marital and financial difficulties he perceived she was experiencing. Judge Saucedo claims Tovar turned on him and manipulated his well-intentioned efforts to assist her, as evidenced by her decision to keep all of the gifts.
In the sections below, we first explain why we adopt the masters’ credibility determinations and then address our factual findings on the two major factual issues in dispute.
2. Credibility Findings of Tovar and Judge Saucedo
In those instances where the testimony of Judge Saucedo and Tovar conflicted, the masters found Tovar’s testimony to be credible and her version of events to be true. The masters found significant portions of Judge Saucedo’s testimony lacked credibility. We adopt these credibility determinations both because the masters were in a position to observe the credibility of the witnesses and because these findings are supported by our own independent evaluation of the evidence.
Tovar’s testimony was consistent with, and corroborated by, numerous items of documentary evidence, including her text messages with Judge Saucedo and Werth, and notes and letters given to her by Judge Saucedo. Tovar recalled numerous details of the relevant events, and those details coincided with, and were substantiated by, the content and timing of the documents.
For example, Tovar’s description of Judge Saucedo’s actions in the car dealership break room (that he wanted to “know [her] happiness” and wanted *CJP Supp. 34 her to “be emotional with him”) was followed one hour later by a text from Judge Saucedo (during the workday) in which he said he was “angry with [him]self’; “[t]his is the most difficult message I have ever written”; and “I cannot overcome my embarrassment over my childish, stupid and silly behavior.” Documentary evidence reflects that shortly after this text, Judge Saucedo deposited additional money into Tovar’s bank account and assured her he would buy the car for her.
Likewise, Tovar’s testimony that Judge Saucedo told her he wanted to have more personal contact with her after one of their AAA office meetings was corroborated by Judge Saucedo’s October 30 texts (shortly after a AAA meeting) stating he was “feeling out of balance” and “still feeling under appreciated” and was “embarrassed about [his] feelings,” and his text of the next morning stating, “I sincerely apologize for everything I said or did yesterday that was offensive or hurtful. I should not have communicated while off balance.”
By contrast, Judge Saucedo’s testimony was often disputed by documentary evidence. For example, the judge’s testimony that he sent the flowers to Tovar to acknowledge the anniversary of Tovar’s brother’s death is contradicted both by the fact that the anniversary of her brother’s death was the following month and by the florist note indicating that his identity was not to be disclosed. Also, when asked what privilege he was referring to when he marked the letter to Tovar’s son as “Privileged and Confidential Communication,” he responded that it was directed to the parents, yet the letter was addressed to Tovar’s son. Only after being questioned further by a special master did he acknowledge he was referring to an attorney-client privilege.
Judge Saucedo’s testimony and prior statements were also at odds with his text messages and notes to Tovar. For example, in his Answer, he denied he offered to provide Tovar with spending money for the Disneyland trip, but his testimony and text messages clearly show he committed to giving her this money. He also denied in his Answer that Tovar had told him to stop texting her, yet his AAA note specifically asks for his “texting privileges [to be] reinstated.” Further, he denied telling Tovar that he planned to give her $26,400, even though his October 31 text message clearly states this fact. He also maintained he did not talk with his brother regarding financial support for Tovar, even though he told her in a text that he had spoken with his brother “about you” and “You don’t know how well you are covered.”
Judge Saucedo’s testimony was also inconsistent with assertions made in documents he signed and prior statements. For example, in his June 2014 letter to the commission, he stated, “Ms. Tovar has initiated and entertained all personal contact we had with one another at all times but one.” (Italics *CJP Supp. 35 added.) The statement directly conflicts with the documented facts showing Judge Saucedo frequently initiated the text communications. He also gave conflicting explanations of his statement in the September 30 note that he “voluntarily took a risk” to protect Tovar: he told investigator Buehler that the “risk” referred to was in intercepting the letter at Mr. Tovar’s place of employment; in his Answer, he denied that the “risk” was contacting the husband’s employer; at the hearing, he testified that he was referring to not reporting the anonymous letter. If the judge meant to suggest to Tovar that he was taking a risk in intercepting the letter, as he told Buehler, his credibility is further damaged since he knew he had not intercepted the letter.
Significantly undermining Judge Saucedo’s credibility is the fact that he admitted lying in the past or telling others to lie. He admitted he did not tell the truth on several occasions, including when he falsely told Tovar he had communicated with her husband’s employer. Judge Saucedo not only misrepresented the fact that he had contacted the hospital, he also provided numerous false details to embellish the story (e.g., that he spoke with a person named “John” who was the human resources manager; “John” had the letter on his desk; “John” did not know who Mr. Tovar was; and “John” said he “shredded” the letter during the phone conversation). Judge Saucedo also acknowledged he encouraged Tovar to lie about the flowers and admitted he previously misidentified the delivery date of the flowers. Additionally, he told Tovar to misrepresent the facts regarding the source of the money for the Disneyland vacation and the BMW automobile.
Because the special masters had the opportunity to observe the demeanor of the witnesses, we give special weight to their assessment of credibility. After observing Tovar testify over two days, the masters found Tovar’s testimony to be credible. In support of this finding, the masters stated, “[Tovar] freely acknowledged when she was not sure of a particular fact or a specific date. Tovar was forthright in admitting facts that were damaging to her, and made a good faith effort to explain the reasons for her actions. These explanations appeared to be unrehearsed and truthful. Although Tovar has filed claims based on Judge Saucedo’s conduct and is represented by counsel, we are satisfied her testimony was trustworthy on the issues before us, notwithstanding any financial motivation associated with litigation. Further, although Tovar did not always use the best judgment in responding to Judge Saucedo’s overtures, we are convinced her detailed testimony about Judge Saucedo’s conduct is reliable.”
After observing Judge Saucedo testify over two days, the masters found that “the manner in which Judge Saucedo testified—failing to answer direct questions, providing nonresponsive and sometimes rambling answers, and answering with irrelevant points—created significant doubts as to the truthfulness of his answers.” The masters had to point out to the judge on more than *CJP Supp. 36 one occasion that his answer to a question was nonresponsive. During one exchange with the examiner, a special master interjected and stated, “Judge, he’s asked you three times, and I haven’t gotten the answer yet.” Later in the proceedings, the presiding master told the parties that “Judge Saucedo’s answers have been nonresponsive and gone well beyond.” Yet, still in another instance, the judge gave a nonresponsive and nonsensical response to a special master who asked why he wrote in a text to Tovar that he was in the garage with the red car running. The judge responded, “I was in the garage, and that’s where I kept my—my Mercedes.”
For all these reasons, we adopt the masters’ credibility determinations.
3. Judge Saucedo Wrote the Anonymous Letter and Sent It to Himself
Upon initially reviewing the anonymous letter, the masters were “highly skeptical that Judge Saucedo—a highly regarded, dignified, meticulous judge—could have possibly written the letter and then participated in a convoluted plan to persuade [Tovar] that she needed his help.” However, after carefully considering all of the testimony and closely examining the documents, the masters reached “the inescapable conclusion that Judge Saucedo did write the letter and mailed it to himself for this purpose.” Our exantination of the record leads us to the same conclusion.
Of foremost significance, Judge Saucedo’s actions after receiving the letter make sense only if he was the author. He falsely told Tovar that he would speak with her husband’s employer and ensure the letter would be intercepted before Mr. Tovar received it. The judge further falsely told Tovar that he had contacted the hospital where Mr. Tovar worked and an official agreed to destroy the letter. The masters disbelieved the judge’s testimony that he lied to Tovar because he was concerned with her feelings and wanted to reassure her. Rather, the masters found that he lied to Tovar because he already knew he was the author and no letter had in fact been sent to the hospital. We agree.
If a third party had sent the letter, Judge Saucedo would have known that Mr. Tovar would most likely receive the letter and be very upset with Tovar and Knoy. Under those circumstances, falsely reassuring Tovar that her husband would not receive the letter could have put her in jeopardy and deprived her of an opportunity to explain the situation to her husband before he received the letter. Furthermore, had the husband received the letter, Tovar would have known Judge Saucedo had lied to her. We do not believe the judge would have concocted this false scenario of intercepting the letter at Mr. Tovar’s place of employment had he not been certain that the letter would never be received by Mr. Tovar.
*CJP Supp. 37 Additionally, there is no evidence that Tovar or her husband or his employer ever received a copy of the letter. If a third party had sent the letter to Judge Saucedo to inform Mr. Tovar of his wife’s alleged extramarital affair, it would seem reasonable that this person would also have sent the letter to Tovar’s husband. It is not logical that the letter was sent only to Judge Saucedo if it had been written by a third party.
In fact, Judge Saucedo expressed his awareness that the letter was sent only to him. He testified, and told investigator Buehler, it was his understanding there was only one copy of the letter (the one he received). When the examiner asked him why he did not give Tovar a copy of the anonymous letter, Judge Saucedo responded, “I didn’t want multiple copies out there. Only one had been sent. And at the time, I just wanted to hold onto it. And she didn’t ask me for a copy.” If he had not sent the letter, he would not know that there was only one copy.
Further, Judge Saucedo was aware of possible security and domestic violence concerns that could be triggered if Mr. Tovar received the letter. As a judicial officer, he was aware of his obligation to report this type of correspondence to his presiding judge and law enforcement. He nonetheless took no action to report the matter or to preserve the letter for forensic analysis. Instead, he affirmatively precluded any such actions by demanding that Tovar not tell anyone about the letter. Judge Saucedo was unable to explain these actions, other than to say that ‘“[pjerhaps” he did not “think” about these issues at the time. Given Judge Saucedo’s experience and intelligence, the masters found this explanation to be implausible. Instead, the masters concluded, “Judge Saucedo did not ‘think’ about these issues because he was the author of the letter and its only recipient and thus knew there were no security concerns associated with his receiving the letter.” We agree.
Judge Saucedo’s repeated insistence that Tovar not tell anyone about the letter further supports our finding that he was the author. His explanation that he was trying to protect Tovar from being fired is not plausible. There is no evidence that Tovar would have been fired or disciplined for having an open romantic relationship with a bailiff. On the other hand, not informing court administration about a letter that raised security concerns might well be the basis for discipline. Judge Saucedo instructed Tovar not to reveal the letter to anyone to protect himself, not her.
The judge’s reliance on the letter to create a dependent relationship between himself and Tovar provided additional support for our finding that he wrote the letter. As stated by the masters: “Immediately after showing Tovar the [ajnonymous letter, Judge Saucedo had a specific and defined plan for moving forward, a plan that relied on the contents of the letter and his *CJP Supp. 38 willingness to ‘fix’ the problems raised in the letter. Over the next two months, Judge Saucedo continued to use the letter to pressure Tovar when she sought to distance herself from him. For example, after Judge Saucedo gave her the September 30 note and she told him she did not feel comfortable with his help, Judge Saucedo responded in an angry manner, stating ‘ “What do you mean you don’t want my help anymore? So you mean the [anonymous] letter is true? So is it true about you and Jeremy ? Maybe your husband does need to know about the [anonymous] letter.” ’ ”
Judge Saucedo contends there is insufficient evidence to prove he knew of facts included in the anonymous letter, specifically of Tovar’s prior relationship with Knoy, her cesarean section scar, her tattoos, and information about Tovar’s husband. We agree with the masters that the examiner proffered clear and convincing evidence that the judge was in fact aware of those details.
Witnesses testified that the prior romantic relationship between Tovar and Knoy was widely known at the courthouse and discussed by Tovar and Velasquez in the clerk’s common area directly outside the judge’s chambers (he generally kept his door open).
Regarding Tovar’s tattoos, the masters had the opportunity to observe that Tovar’s tattoos would be clearly visible while wearing her work outfits. Werth testified Tovar’s tattoos were visible at work. Tovar testified that she and Judge Saucedo talked about her tattoos on two occasions. During one of those conversations, Judge Saucedo asked Tovar why she was wearing a Band-aid on her foot, and Tovar explained that the court policy was that employees must cover their tattoos at work (although Tovar did not always follow this policy). In another conversation, Judge Saucedo told Tovar that his son had tattoos and Tovar discussed her tattoos. In light of this evidence, we reject Judge Saucedo’s testimony that he was unaware of the tattoos.
As to the reference to Tovar’s “c-scar,” the masters credited Tovar’s testimony that she had discussed with Judge Saucedo the fact that she had a cesarean section when he saw a photograph of her infant in an incubator. We adopt this finding and also find Judge Saucedo was aware of this fact through the frequent personal discussions among staff in the common area outside his chambers.
Further, although Tovar generally referred to her husband as “Lalo” and the letter was addressed to “Hilario Tovar,” Judge Saucedo admitted he was aware that Lalo is a common nickname for Hilario. He also acknowledged he knew Mr. Tovar worked for a health care provider in the area. Tovar testified she was excited her husband had recently gotten a job at the medical center and she mentioned that to court staff and the judge. Additionally, when Judge *CJP Supp. 39 Saucedo first showed Tovar the anonymous letter, he pointed out that the letter had been sent to her husband’s employer, reflecting he was aware that Mr. Tovar worked at the Tulare Regional Medical Center.
Finally, contrary to Judge Saucedo’s contentions, the fact that the forensic analysis did not find that the anonymous letter was written on his court computer is not dispositive because the evidence shows the analyst did not find evidence of the other notes and letters that Judge Saucedo admitted writing. Further, we reject as implausible Judge Saucedo’s claim that he did not know how to type an envelope to himself, or that he could not have printed the self-addressed envelope. Additionally, the fact that the examiner did not “prove” the precise location of the mailbox that Judge Saucedo used to mail the letter is not dispositive. The evidence shows the letter was received at a distribution center that processes mail from the area where Judge Saucedo lived and worked, and that Judge Saucedo was in this vicinity at the time the letter was mailed.
This evidence leaves us clearly convinced that Judge Saucedo wrote the anonymous letter and sent it to his own home address. We see no other reasonable interpretation of the evidence.
4. Judge Saucedo’s Actions Were Not for the Purpose of Mentoring Tovar
Judge Saucedo claims he and Tovar jointly agreed to embark on a “mutual venture” to solve the problems raised by the letter, to reconcile her marriage and build her self-esteem. He testified that the “mentoring” relationship fell apart because Tovar improperly focused on details and not “the process.” As did the masters, we find by clear and convincing evidence Judge Saucedo wrote the anonymous letter as part of a predesigned plan to manufacture Tovar’s dependence on him, hoping it would lead to a closer personal or “emotional” relationship with Tovar. We reject his claim he intended only to “mentor” her or that his improper actions can be properly blamed on any of Tovar’s actions. We agree with the masters that although Tovar “made some poor choices in continuing to accept gifts, and, in one instance, demanded Judge Saucedo make good on his financial ‘promises,’ these considerations do not excuse the fact it was Judge Saucedo who initiated the relationship through false means and then improperly used his position and financial rewards to pressure his court clerk into maintaining an inappropriate and unwanted personal relationship.”
Mentoring involves advice, direction, referrals and encouragement. As stated by the special masters, “Mentoring is not accomplished by providing a *CJP Supp. 40 subordinate with thousands of dollars in gifts, including a BMW car and vacation,” an offer to pay for body sculpting or ‘“expecting a ‘special’ friendship in exchange.”
Further, the overly personal and emotional language the judge used in his text messages and notes to Tovar is far from the type of supportive but professional communication one would expect in a mentoring relationship (i.e., ‘“It’s silly but still feeling under appreciated”; ‘“I, too, am human and have an ego. Feel free, if you wish, to compliment me if you like things I do or wear . . .”). Further, the judge repeatedly stated and suggested that he wanted a closer or ‘“special” relationship with Tovar in exchange for his ‘“gifts,” something that would not be expected or appropriate in a mentoring relationship (‘“If you want me to be an ordinary friend like I was before September, I will provide only moral support. But if you want me for a special friend, everything is on line with full financial and moral support going forward. Special friend means you want to make time and effort to share thoughts and experiences with me”; telling Tovar that his accountant questioned why he was buying her all of these gifts and whether this was a ‘“one sided friendship”).
It is undisputed that Judge Saucedo has successfully and enthusiastically mentored numerous individuals out of a sense of compassion and desire to help. But the judge’s conduct here does not remotely resemble the conduct described by the many witnesses and declarants who lauded Judge Saucedo’s willingness to assist them (mentoring law school graduates to pass the bar exam; supervising and mentoring legal interns and new attorneys; mentoring students in a program bridging high school and college; mentoring members of the community professionally and personally by providing advice and encouragement).
Judge Saucedo testified that he is a highly ordered and structured person who focuses on ‘“framework” and ‘“process” when working with others. In his closing statement, Judge Saucedo’s counsel argued that everything that Judge Saucedo ‘“does, he does with vigor and does it in a deliberate and organized way.” The evidence establishes that this is precisely how Judge Saucedo approached his desire to have a closer personal relationship with his female clerk. We agree with the masters that Judge Saucedo ‘“devised the plan to send a crude and ‘vile’ letter accusing her of sexual infidelity and apparently envisioned that Tovar would rely on him to become the person who would protect her and ‘fix’ her life problems (or what Judge Saucedo perceived to be her life problems).”
*CJP Supp. 41 I. Judge Saucedo ’s Background and Character Witness Evidence
Judge Saucedo presented evidence about his personal and professional background. His parents were immigrants who worked as farm workers. The judge received financial aid to abend the University of California at Berkeley and worked with his family in the farm fields on weekends and breaks. After earning his law degree from Stanford, he practiced law for more than 24 years in the Central Valley, primarily with rural legal service agencies and at a private law firm representing plaintiffs in employment class action matters. The judge was on the Lindsay City Council, and was later appointed mayor.
Judge Saucedo presented substantial character evidence, including the testimony of 16 witnesses and more than 100 supporting declarations from judges, community leaders, community members, religious leaders, attorneys, court staff and former mentees.[9] In general, the witnesses described the judge as a fair, generous, honest, respectful, courteous, caring and hardworking judge, attorney and leader. He devotes substantial time to volunteering for organizations and mentoring young professionals. The judge provided bar examination tutoring to a number of recent law school graduates who came from underprivileged backgrounds and who had difficulty passing the bar exam. He also provided mentoring and support to many young lawyers starting out their careers in public interest law and has been a positive influence in the lives of members of his community.
Based on this evidence, we adopt the masters’ finding that Judge Saucedo has had a distinguished career as a judge, attorney, and community leader, has very strong support from his colleagues, attorneys, community leaders and community members, and has provided substantial assistance to many individuals in need of his assistance.
III.
LEGAL CONCLUSIONS
A. Violations of the California Code of Judicial Ethics
The Notice alleged Judge Saucedo violated several canons of the California Code of Judicial Ethics: California Code of Judicial Ethics, canons 1, 2, 2A, *CJP Supp. 42 2B(1), 3C(5), and 4G. Those canons, as pertinent here, require a judge to personally observe high standards of conduct “so that the integrity and independence of the judiciary is preserved” (canon 1); “avoid impropriety and the appearance of impropriety in all of the judge’s activities” (canon 2, capitalization omitted); “act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary” (canon 2A); “not allow family, social, political, or other relationships to influence the judge’s judicial conduct or judgment” nor “ convey or permit others to convey the impression that any individual is in a special position to influence the judge” (canon 2B(1)); “avoid nepotism and favoritism” (canon 3C(5)); and not practice law (canon 4G).
We conclude that Judge Saucedo violated each of these canons through the following conduct. First, Judge Saucedo’s authorship of the anonymous letter violated California Code of Judicial Ethics, canons 1, 2, and 2A. This conduct violates the high standards required of a judge, undermines the integrity of the judiciary, and diminishes public confidence in the integrity of the judiciary.
Second, Judge Saucedo’s failure to report the anonymous letter to his presiding judge, court administration or law enforcement violated California Code of Judicial Ethics, canons 1, 2 and 2A. This conduct violates the high standards of conduct required of a judge, undermines the integrity of the judiciary, and diminishes public confidence in the integrity of the judiciary.
Third, Judge Saucedo’s conduct in using the anonymous letter as a means to promote a closer personal relationship with Tovar violated California Code of Judicial Ethics, canons 1, 2 and 2A. This conduct violates the high standards required of a judge, undermines the integrity of the judiciary, and diminishes public confidence in the integrity of the judiciary.
Fourth, Judge Saucedo’s course of conduct during September 18 through November 19 that included giving Tovar, a subordinate employee, substantial monetary and tangible gifts as a means to convince her to become involved in a closer personal relationship violated California Code of Judicial Ethics, canons 1, 2, 2A, and 3C(5). This conduct violates the high standards required of a judge, undermines the integrity of the judiciary, diminishes public confidence in the integrity of the judiciary, and manifests favoritism toward a subordinate employee.
Fifth, Judge Saucedo’s extortion allegation, and the manner in which he made the accusation, violated California Code of Judicial Ethics, canons 1, 2, 2A, and 2B(1). Judge Saucedo interrupted court proceedings to hand Tovar a note accusing her of extortion. By doing so, Judge Saucedo improperly used *CJP Supp. 43 the power of his judicial office to intimidate Tovar and seek to ensure her silence regarding his conduct during the previous two months. Judge Saucedo also failed to report the claimed extortion demand to law enforcement or court officials. Judge Saucedo’s conduct concerning the extortion claim violated the high standards required of a judge, and violates his duties to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Sixth, Judge Saucedo’s conduct in providing Tovar’s son with legal advice violated California Code of Judicial Ethics, canon 4G.[10]
B. Level of Misconduct
A judge who violates the California Code of Judicial Ethics engages in one of three types of judicial misconduct: (1) willful misconduct, (2) prejudicial misconduct, and (3) improper action. A judge may be removed from office or censured based on the first two, but not the third. (Cal. Const., art. VI, § 18, subd. (d).)
Willful misconduct is (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in a judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091.)
Failure to comply with the canons of judicial ethics is generally considered to constitute unjudicial conduct. (Adams v. Commission on Judicial Performance (1994) 8 Cal.4th 630, 662 [34 Cal.Rptr.2d 641, 882 P.2d 358].)
In the context of willful misconduct in judicial office, a judge acts in bad faith “only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.)
The third element of willful misconduct—acting in a judicial capacity—is discussed below.
Prejudicial misconduct is “conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” (Cal. Const., art. VI, § 18, *CJP Supp. 44 subd. (d).) Prejudicial misconduct occurs when an objective observer would conclude the judge’s improper conduct was “ ‘ “prejudicial to [the] public esteem for the judicial office,” ’ ” regardless of the motive or intent of the judge. (Broadman, supra, 18 Cal.4th at p. 1092.) Prejudicial misconduct differs “from willful misconduct in that a judge’s acts may constitute prejudicial conduct even if not committed in a judicial capacity, or, if committed in a judicial capacity, not committed in bad faith.” (Ibid.) Unjudi-cial conduct committed in bad faith by a judge not acting in a judicial capacity constitutes prejudicial misconduct. (Id. at pp. 1092-1093.) “In this context, bad faith means a culpable mental state beyond mere negligence and consisting of either knowing or not caring that the conduct being undertaken is unjudicial and prejudicial to public esteem.” (Id. at p. 1093.)
Improper action occurs when the judge’s conduct violates the canons, but the circumstances do not rise to the level of prejudicial misconduct and do not bring the judiciary into disrepute. (Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 899 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams II).)
Each of Judge Saucedo’s canon violations constitutes, at minimum, prejudicial misconduct. The judge’s conduct was improper in myriad ways. He authored the anonymous letter containing crude and sexually explicit language, and then used the letter to create a closer “emotional” relationship with his clerk, pressured her with expensive gifts and other benefits to comply with his requests for a closer relationship, and presented her with the extortion note in open court to discourage her from reporting his conduct. We agree with the masters’ conclusion that an objective observer would readily conclude the judge’s conduct was highly prejudicial to the “public esteem for the judicial office,” and that Judge Saucedo brought the judicial office into disrepute.
We also agree with the masters that the judge acted in bad faith with respect to the entire course of conduct as charged in the Notice and as proven by clear and convincing evidence at the hearing before the special masters. His creation of the anonymous letter for the sole purpose of manipulating his courtroom clerk is the essence of an act committed in bad faith. Further, Judge Saucedo’s ongoing efforts to conceal his conduct, and his acknowl-edgement that his career would be “toast” if his conduct was revealed, show he was aware his conduct was wrong and unjudicial.
With respect to the extortion note, Judge Saucedo testified that Tovar threatened to report him unless he paid her $8,000. Instead of disclosing this conduct to his superiors or law enforcement, he deposited this money into her account and engaged in this conduct hoping to intimidate her to adhere to her *CJP Supp. 45 promise not to report him if he paid the money. Judge Saucedo—who had been a judge for more than 10 years and had been presiding over criminal matters for at least three years—clearly knew his making extortion allegations against Tovar, while he was on the bench, was not within his judicial powers. At the very least, Judge Saucedo engaged in the conduct with a conscious disregard for the limits of his judicial authority.
Having concluded that Judge Saucedo engaged in unjudicial conduct in bad faith, our determination of whether any of his actions constitute willful misconduct, in addition to conduct prejudicial to the administration of justice, turns on whether he was acting in a judicial capacity (the third element of willful misconduct). The judge argues that none of his conduct took place in a judicial capacity. The examiner acknowledges that most of Judge Saucedo’s improper activities were performed away from the courtroom and were not undertaken in connection with his judicial functions or through explicit use of his judicial authority. However, the examiner contends that Judge Saucedo was acting in a judicial capacity and thus engaged in willful misconduct when he (1) initiated the personal relationship with Tovar by meeting with her to show her the letter and create a plan of action and (2) handed Tovar the letter in the courtroom accusing her of extortion. We agree and conclude that the judge engaged in willful misconduct in those instances and in prejudicial misconduct with respect to his other improper conduct.[11]
A judge is acting in a judicial capacity while performing one of the functions associated with the position of a judge, whether adjudicative or administrative in nature. (Broadman, supra, 18 Cal.4th at p. 1104.) When a judge is in chambers or other locations in the courthouse during working hours, the judge is “generally, though not necessarily, acting in a judicial capacity.” (Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (Dodds).) A judge is also acting in a judicial capacity if he or she uses or attempts to use the authority of the judicial office for an improper purpose. (Ibid.)
When Judge Saucedo initially called Tovar into chambers and showed her the anonymous letter, he specifically instructed her not to report the letter to court administration and told her that reporting the letter could result in her being fired. By so doing, the judge was acting in a supervisory capacity. One of the functions associated with judicial authority is supervising staff. (Dodds, supra, 12 Cal.4th at p. 175.) We do not believe that any reasonable person would view the judge’s comments about being fired as personal advice from *CJP Supp. 46 a friend. From Tovar’s point of view, she was called into chambers and instructed to meet in the law library conference room to discuss a personnel issue. We recognize that not all conduct toward court staff is undertaken in a judicial capacity. In Dodds, the Supreme Court held the judge was not acting in a judicial capacity when he failed to report a colleague whom he observed deflate a van tire in the court parking lot, and suggested that his staff refuse to talk to the investigating officer. In reaching this conclusion, the Supreme Court first emphasized that Dodds was not acting as a supervisor when he recommended to staff that they decline to give a statement; rather, he was giving advice to a co-witness concerning an event he witnessed outside of his judicial function. In this regard, the Supreme Court stated, “To hold that petitioner acted in a judicial capacity simply because his advice carried with it a degree of authority due to his status as a judge and supervisor would mean that a judge is always acting in a judicial capacity when he talks to staff.” (Ibid.) Second, the Supreme Court noted that the judge met with the detective at the courthouse only because it was a convenient meeting place the detective selected. The present case is distinguished from Dodds because Judge Saucedo was giving Tovar advice about a court personnel matter. Additionally, they met in the private room in the court library not because it was convenient, but because the judge did not want the conversation to be overheard. For these reasons, we conclude that Judge Saucedo used his judicial authority during these initial encounters for the purpose of advancing his plan to entice Tovar into developing a closer, “special” relationship with him.
We also conclude that Judge Saucedo was acting in a judicial capacity, and thus engaged in willful misconduct when he handed Tovar the extortion note in court on November 19.
As the masters concluded, “When he handed Tovar the letter, Judge Saucedo was on the bench presiding over a court case and thus presumptively acting in a judicial capacity. He also specifically attempted to use his authority as a judge for improper ends (silencing Tovar), which necessarily supports a finding of judicial capacity.” (See Dodds, supra, 12 Cal.4th at p. 172.)
Thus, we conclude that Judge Saucedo engaged in a course of highly improper conduct toward Tovar over a two-month period that constitutes willful misconduct in those instances when he was acting in a judicial capacity and prejudicial misconduct in all other instances. Even if Judge Saucedo had not been acting in a “judicial capacity” during his initial meetings with Tovar and when he handed her the extortion note, the entirety of his misconduct warrants removal. (A judge may be removed for prejudicial misconduct, as well as willful misconduct. [Cal. Const., art. VI, § 18, subd. (d).])
*CJP Supp. 47 IV.
JUDGE SAUCEDO’S DUE PROCESS AND EVIDENTIARY ARGUMENTS
A. The Investigation
Judge Saucedo asserts his due process rights were impaired because Buehler, the investigator for the Judicial Council, did not request or preserve any electronic evidence from witnesses other than Tovar. He also complains that he did not have unfettered access to some of the witnesses, including court bailiffs, court clerks and other court staff.
The judge cites no legal authority in support of his due process argument. In response to these same arguments, the masters concluded the judge did not show error or any undue prejudice to his defense. We agree.
Judge Saucedo was given full discovery after the initiation of formal proceedings and the opportunity to call any witnesses. The judge was represented by counsel during both the Judicial Council’s investigation and the commission’s preliminary investigation.
Judge Saucedo complains that the commission was not able to retrieve all text messages from Tovar’s phone over the two-month period at issue. (Some witnesses had already deleted text messages.) He states that Tovar and other witnesses “altered” evidence by deleting text messages, and that the loss of this “critical evidence” impairs his due process rights. The judge does not suggest that the commission had anything to do with this alleged “altering” of evidence or text messages. Nor has he identified how text messages deleted by Tovar or other witnesses were “critical” to his case. (See Broadman, supra, 18 Cal.4th at p. 1108 [court rejected judge’s argument that judge’s due process rights were violated because of delay in interviewing witnesses where judge did not identify the testimony of any material witness whose memory was impaired by the passage of time].) Moreover, the judge has not presented proof that any text messages were deleted for nefarious reasons. In fact, the judge admitted that he regularly deletes messages on his own phone.
The judge also complains that Buehler did not ask to look at the cell phones of certain peripheral witnesses. Once again, the judge has not suggested how this would have been helpful to his case. Further, the commission is not responsible for the investigation conducted by Buehler.
Judge Saucedo also contends that the commission was biased because it conducted a forensic search only of his computer. However, the judge has not shown that there was reliable evidence that anyone else wrote the letter.
*CJP Supp. 48 Additionally, Judge Saucedo argues that he was not given access to Tovar and Knoy and other witnesses who refused to speak with the judge. The judge was provided with witness statements from commission interviews and had the opportunity to depose up to four witnesses. The judge deposed Tovar for over seven hours, more time than permitted by commission rules. (Rule 122(g).)[12]
In Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518, 526-529 [247 Cal.Rptr. 378, 754 P.2d 724], the Supreme Court rejected the judge’s claim that his due process rights were violated because the examiner admonished witnesses during the preliminary investigation that they were not to talk to anyone about the subject of the investigation, and certain witnesses refused to speak with him. The Supreme Court put the burden on the judge to show that the witnesses refused to speak with him because of the witness admonishment and how such refusal prejudiced his preparation for the hearing. Because the judge could not establish either, the Supreme Court rejected his due process argument.
In this case, Judge Saucedo does not claim that the examiner prevented the witnesses from speaking with him through an admonishment or in any other manner. Nor does he identify how his failure to speak with the witnesses prejudiced his preparation for the hearing. In addition to the deposition of Tovar, the judge was provided with the statements Tovar gave to Buehler and commission staff, and cross-examined her extensively at the hearing before the special masters.
We concur with the conclusion of the masters: “Judge Saucedo had the full and fair opportunity to present his defense at the Special Masters’ hearing and was at all times represented by experienced and very able counsel. There was no due process violation.”
B. Uncharged Incidents
The masters found that Judge Saucedo engaged in willful misconduct with respect to two incidents that were not charged in the Notice. The first concerned the judge’s meeting in chambers with Tovar to discuss the anonymous letter on the late afternoon of Friday, September 20. In response to inquiries about why Tovar did not clock out until after 5:00 p.m., Judge *CJP Supp. 49 Saucedo sent an e-mail to Tovar’s supervisor stating he wanted to confirm Tovar worked after 5:00 p.m. at his request and they were working on orders concerning inmate prescriptions. The examiner presented evidence refuting that they were working on prescription orders or other court matters during this after-hours meeting. The judge did not object to the introduction of this evidence at the hearing.
The second incident involved an incident report filed by Sheriffs Deputy Scott Ballantyne, a court bailiff. Judge Saucedo introduced evidence that Tovar was disciplined based on a report submitted by Ballantyne concerning a delayed release of a prisoner as a result of Tovar’s clerical error. Upon learning of this report, Judge Saucedo banished Ballantyne from his courtroom during a proceeding and recommended that Ballantyne be terminated.
The examiner requests that the commission not adopt the masters’ legal conclusion that the judge engaged in willful misconduct with respect to these incidents because they were not charged in the Notice. We concur and do not reach conclusions as to whether the judge engaged in misconduct with respect to either incident or consider them as a basis for discipline. (See Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678, 695-696 [122 Cal.Rptr. 778, 537 P.2d 898] (Cannon); rule 128(a).)
Judge Saucedo argues that “the Examiner presenting evidence on these topics that were not contained in the Notice cannot be cured by the Examiner now rejecting those findings. . . . [T]he Commission must consider what impact this fundamentally unfair and prejudicial actions [s/c] had on the entirety of the Special Masters’ Findings when deciding on the appropriate level of discipline in this matter.” Significantly, Judge Saucedo raised this argument for the first time in his response brief to the commission, after the issue of the masters reaching legal conclusions based on conduct not charged in the Notice was raised by the examiner in his opening brief.
There is no reasonable possibility that the incidents concerning Ballantyne and overtime pay influenced the masters’ findings on the far more serious charges concerning the anonymous letter and the inappropriate gifts to Tovar. In their 110-page report, the masters gave detailed and distinct support for their findings and conclusions on each charged incident.
Furthermore, it was the judge, not the examiner, who introduced the Ballantyne incident into the proceedings, and he did not object to the introduction of evidence concerning the overtime incident. Thus, we reject the judge’s contention that he was prejudiced by the introduction of evidence on these incidents.
*CJP Supp. 50 y.
DISCIPLINE
In determining the appropriate disciplinary sanction, we consider the purpose of commission disciplinary proceedings, which, as stated by the Supreme Court, “is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.” (Adams II, supra, 10 Cal.4th at p. 912.) Adherence to these objectives compels our decision to remove Judge Saucedo from office. He engaged in a calculated course of egregious misconduct involving dishonesty and subterfuge that seriously undermines the integrity of the judiciary and falls exceedingly short of the rigorous standards to which the judiciary is held.
The commission has identified several factors to consider in determining the appropriate sanction, including the judge’s honesty and integrity, the number of acts and seriousness of the misconduct, whether the judge appreciates the impropriety of the conduct, the likelihood of future misconduct, the impact of the misconduct on the judicial system, and the existence of prior discipline. (Inquiry Concerning McBrien (2010) No. 185, Decision and Order Imposing Public Censure, pp. 29-33 [49 Cal.4th CJP Supp. 315, 342-345]; see Inquiry Concerning Van Voorhis (2003) No. 165, Decision and Order Removing Judge from Office, p. 31 [48 Cal.4th CJP Supp. 257, 295]; see also Policy Declarations of Com. on Jud. Performance, policy 7.1.)
Foremost in our consideration of these factors is honesty and integrity. The Supreme Court stated that honesty is a “minimum qualification[]” that is “expected of every judge.” (Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239].) Judge Saucedo’s misconduct demonstrates a profound lack of veracity and integrity—tie created a false, sexually explicit letter; lied to Tovar about the source of the letter and having intercepted the letter; and told Tovar to lie to her family, friends and court administration, all for the corrupt purpose of manipulating a subordinate employee into having a closer “emotional” relationship with him. Moreover, his deception did not stop when his conduct was reported, but continued throughout these proceedings. The masters stated, “Judge Saucedo was not truthful in the investigation or at the hearing. He refused to admit important documented facts, failed to answer direct questions, and made affirmative misrepresentations.” The Supreme Court has said there are few actions that “provide greater justification for removal from office than . . . deliberately providing false information to the Commission in the course of its investigation . . . .” (Adams II, supra, 10 Cal.4th at p. 914.)
*CJP Supp. 51 We take particularly seriously a judge’s willingness to lie under oath to the three special masters appointed by the Supreme Court to make factual findings critical to our decision. In removing Judge Kelly MacEachern for misconduct involving dishonesty compounded by untruthful testimony before the special masters, we stated, “In seeking the truth, our justice system relies on the integrity of the oath. A judge who does not honor the oath to tell the truth cannot be entrusted with judging the credibility of others.” (Inquiry Concerning MacEachern (2008) No. 184, Decision and Order Removing Judge from Office, p. 21 [49 Cal.4th CJP Supp. 289, 309] (MacEachern).)
Judge MacEachern’s misconduct involved making misrepresentations about her attendance at a judicial education seminar on her claim for reimbursement and subsequent communications with the court travel coordinator. The masters found that she was untruthful in her response to the commission’s investigation and in material portions of her testimony at the hearing. The commission concluded that the lack of integrity reflected in the judge’s misconduct, aggravated by her subsequent untruthful statements during the commission investigation and under oath before the special masters compelled the judge’s removal from office. (MacEachern, supra, No. 184 at p. 1 [49 Cal.4th CJP Supp. at p. 293].) Other judges have also been removed based, in significant part, on a lack of veracity and integrity. (Inquiry Concerning Hall (2006) No. 175, Decision and Order Removing Judge from Office [49 Cal.4th CJP Supp. 146] [misconduct included judge signing four campaign statements under oath falsely listing herself as the source of a $20,000 campaign contribution]; Inquiry Concerning Couwenberg (2001) No. 158, Decision and Order Removing Judge from Office [48 Cal.4th CJP Supp. 205] [extensive misrepresentations to Governor and commission concerning past educational, career and military history]; Inquiry Concerning Murphy (2001) No. 157, Decision and Order Removing Judge from Office [48 Cal.4th CJP Supp. 179] (Murphy) [judge lied about his ill health to remain on payroll while attending medical school in the Caribbean].)
The nature and number of acts of misconduct is another important factor in our determination of the appropriate sanction. (Policy Declarations of Com. on Jud. Performance, policy 7.1(l)(a), (b).) The number of acts of misconduct is relevant to discipline to the extent it shows isolated incidents, or a pattern that demonstrates the judge lacks judicial temperament and the “ ‘ “ability to perform judicial functions in an even-handed manner.” [Citation.]’ [Citation.]” (Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958].) Judge Saucedo’s misconduct involved far more than a single inappropriate text message or gift to a subordinate employee; he engaged in an ongoing course of subterfuge and *CJP Supp. 52 dishonesty over a two-month period. The deceptive and calculated nature of the judge’s conduct is incompatible with the temperament and integrity required of a judge.
Judge Saucedo contends that his conduct is less serious than the conduct of Judge Cory Woodward and Judge Scott Steiner that resulted in censures by the commission in 2014. (Censure of Woodward (2014); Censure of Steiner (2014).) Both judges were disciplined for engaging in sexual activity in chambers, Judge Woodward with his clerk and Judge Steiner with two former students in his law school class. In addition, Judge Woodward was not forthright with court administration when questioned about the nature of his relationship with his clerk. Those cases were similar to the present case in that they involved serious misconduct that was damaging to the decorum and esteem of the judicial system. However, those cases differ from the present matter in significant ways—the relationships were consensual and did not involve unwelcome advances and pressure to engage in a personal relationship, the judges did not use subterfuge and dishonesty in pursuit of the relationships, and the judges did not lie under oath about their conduct. Moreover, in both Woodward and Steiner, the commission found in mitigation that the judges acknowledged their wrongdoing and expressed great remorse and contrition. (Woodward, supra, at p. 7; Steiner, supra, at p. 6.)
Rather than show an appreciation of the serious nature of his misconduct, Judge Saucedo continues to deny the essential facts, blame Tovar for his conduct and minimize the gravity of his misconduct to a brief lapse in judgment. He apologizes for his wrongdoings, but his remorse is limited to appearing too familiar with Tovar in his effort to “mentor” her, and failing to report the anonymous letter and Tovar’s alleged “demand” for $8,000 to court administration. Even at his appearance before the commission, he continued to blame Tovar for his conduct, stating that Tovar “was asking for more and more, and [he] didn’t know how to get out of the situation . . . .” This statement reflects the judge’s continued denial of the fact that he was the one who offered Tovar gifts and favors for his own manipulative purposes and his failure to appreciate the gravity of his misconduct.
“A judge’s failure to appreciate or admit to the impropriety of his or her acts indicates a lack of capacity to reform.” (Inquiry Concerning Platt (2002) No. 162, Decision and Order Removing Judge from Office, p. 15 [48 Cal.4th CJP Supp. 227, 248]; see Policy Declarations of Com. on Jud. Performance, policy 7.1(2)(a).) It may be unlikely that Judge Saucedo would again jeopardize his career by engaging in this precise type of conduct; however, we are concerned that the traits and lack of judgment that led to the misconduct in this *CJP Supp. 53 case could lead to future improper actions demeaning to the esteem of the judiciary. This is a risk we cannot run and still fulfill our responsibility to protect the public and the reputation of the judiciary.
Whether the misconduct undermines the integrity of the judiciary, respect for the judiciary or the administration of justice is another important factor in our consideration of the appropriate discipline. (Policy Declarations of Com. on Jud. Performance, policy 7.1(l)(h).) Judge Saucedo asserts that his conduct had no impact on the judicial system because no case or litigant was affected. This ignores the impact of his conduct on the public’s perception of the judiciary. As the commission has previously noted, “The public will not, and should not, respect a judicial officer who has been shown to have repeatedly lied for his own benefit.” (Murphy, supra, No. 157 at p. 18 [48 Cal.4th CJP Supp. at p. 202].)
Judge Saucedo’s plea for censure, rather than removal, focuses on his lack of prior discipline and the strong support he has earned as a judge and community leader. We recognize and appreciate the many contributions Judge Saucedo has made to his community and the legal profession, and to promoting diversity on the bench and in the legal profession. Nonetheless, his lack of prior discipline and distinguished career cannot undo his egregious misconduct in this case. While mitigating evidence may be taken into account in determining the totality of the circumstances as pertinent to determining the appropriate discipline, “[t]here can be no mitigation for maliciously motivated unjudicial conduct.” (Spruance v. Commission on Judicial Qualifications (1975) 13 Cal.3d 778, 800 [119 Cal.Rptr. 841, 532 P.2d 1209]; see Cannon, supra, 14 Cal.3d at p. 707; Broadman, supra, 18 Cal.4th at p. 1112; Freedman, supra, No. 179 at p. 7 [49 Cal.4th CJP Supp. at p. 232].) Certain misconduct is so completely at odds with the core qualities and role of a judge that no amount of mitigation can redeem the seriousness of the wrongdoing or obviate the need for removal in order to fulfill our mandate to protect the public, enforce high standards of judicial conduct, and maintain public confidence in the integrity of the judiciary. This is such a case. As such, we issue the following order removing Judge Saucedo from office.
ORDER
This decision shall constitute the order of removal of Judge Valeriano Saucedo, pursuant to the provisions of article VI, section 18 of the California Constitution; pursuant to that section of the Constitution and rules 120(a) and 136 of the Rules of the Commission on Judicial Performance, Judge Saucedo is hereby disqualified from acting as a judge.
Commission members Hon. Erica R. Yew, Ms. Mary Lou Aranguren, Hon. Thomas M. Maddock, Dr. Michael A. Moodian, Nanci E. Nishimura, Esq., *CJP Supp. 54 Hon. Ignazio J. Ruvolo, Mr. Richard Simpson, Ms. Sandra Talcott and Mr. Adam N. Torres voted in favor of all the findings and conclusions expressed herein and in the order of removal and disqualification. Commission member Pattyl A. Rasparían did not participate. Commission member Anthony P. Capozzi, Esq., was recused.

 The letter was postmarked September 16, 2013.

 Mrs. Saucedo testified at length about her husband’s whereabouts the days before they received the anonymous letter. She and Judge Saucedo stayed overnight in San Jose on Saturday, September 14, to attend an opera. After returning home together the next morning, they went to Orchard Supply Hardware and then spent several hours together at the courthouse in Visalia. On Monday, September 16, Mrs. Saucedo drove her husband to and from the Visalia courthouse and they had lunch together. Mrs. Saucedo did not testify that her husband never left her presence during these days.

 The judge denied giving Tovar a cover letter. We find that there was a cover letter. Our finding is supported by the facts that Tovar reported the existence of a typed cover letter to human resources when she reported the judge’s conduct in December 2013; that the judge had a practice of typing notes to Tovar, many of which were admitted at the hearing; and that the message in the cover letter was consistent with his later notes and texts professing his desire to “help” her.

 Typographical errors in text messages and notes from here on have not been corrected.

 When asked at the special masters’ healing what he was “embarrassed about,” Judge Saucedo said: “My feelings about mortality,” and “coming to grips” with the fact that many of his friends and colleagues were suffering from serious health problems.

 It is not entirely clear from the record whether this statement was made in a text or in a phone call, but it is undisputed Tovar communicated these words to Judge Saucedo. The statement is included in a document prepared by Judge Saucedo reflecting the content of certain text messages previously contained on his phone (that he later deleted).

 In her testimony, Kennedy denied Judge Saucedo had given her this letter, or had discussed his resignation or retirement with her. Investigator Buehler testified that Judge Saucedo told her he discussed the possibility of his retirement with Kennedy.

 In October, Tovar had a brief meeting with a court manager. She told the manager that she was overwhelmed with the work in her department and thought it was time for a transfer. Tovar decided not to proceed with her transfer request when the manager told her that Judge Saucedo would have to be informed of Tovar’s request.

 On September 29, 2015, prior to the appearance before the commission, the commission chairperson, Hon. Erica R. Yew, sent a letter of disclosure to the parties concerning Dale Minami, an attorney who submitted a supporting declaration on Judge Saucedo’s behalf. The letter, which is included in the public file of these formal proceedings, discloses Judge Yew’s social and professional contacts with Mr. Minami over the past 12 years, and that he previously made a donation to a nonprofit foundation that her husband founded and in which he serves as president.

 The masters also concluded that Judge Saucedo engaged in willful misconduct in providing false information to Tovar’s supervisors to justify overtime work and with regard to an incident involving Deputy Scott Ballantyne. As discussed later, we do not adopt the masters’ conclusions that the judge engaged in misconduct with respect to these incidents because they were not charged in the Notice.

 The masters concluded that Judge Saucedo was acting in a judicial capacity and engaged in willful misconduct concerning the extortion note, but not during the initial communications with Tovar about the anonymous letter. For reasons discussed below, we reach a different conclusion with respect to the judge’s initial communications with Tovar.

 After having deposed Tovar for the full seven hours authorized by commission rule 122(g)(2)c, Judge Saucedo made a request for an additional two hours to depose Tovar. Upon considering the request, the examiner’s opposition, and the judge’s reply, the commission denied the request because the judge failed to establish any specific and material area of examination he was unable to complete within the seven allotted hours or that his due process rights were impaired.